## Ellison v. Commonwealth.

(Decided June 16, 1922.)

## Appeal from Whitley Circuit Court.

1. Criminal Law—Accidental Killing—Evidence.—Evidence examined and the verdict held not to be flagrantly against the weight of the evidence on the issue whether a shooting was accidental.

2. Homicide—Substantive Evidence—Motive.—On the trial of one charged with homicide, where the defense was he had accidentally shot the deceased, who was his sweetheart, evidence of previous occurrences between them bearing upon the question of motive and on the issue whether the killing was accidental was substantive evidence on those issues, and therefore admissible, although it involved a statement of facts showing the commission of another public offense by defendant.

3. Criminal Law—Impeachment of Witness.—Questions designed to lay the foundation for impeaching certain statements of a witness must fix the time, place and circumstances and the persons present when the alleged contradictory statements were made.

4. Criminal Law—Defense of Accident—Instructions.—The failure of the court in its instruction submitting the defense of accident, to require the jury to believe "from the evidence" that defendant shot and killed deceased by accident, was not prejudicial error against him, for it authorized the jury to acquit him if they believed the shooting to be accidental whether they so believed from the evidence or not.

5. Criminal Law—Instructions.—It was not error against the defendant, whose only defense was that the shooting was an accident, in giving instructions on murder and voluntary manslaughter to use the customary phrase in such instructions "and not in his necessary or reasonably apparent necessary self-defense," such expression being merely descriptive of those crimes.

6. Criminal Law—Continuance.—The court did not abuse its discretion in overruling appellant's motion for a continuance based on

affidavits of physicians as to his physical condition where the record shows defendant thereafter attended the trial, testified intelligently, and suffered no physical misfortune by reason thereof.

R. L. POPE and R. C. BROWNING for appellant.

CHAS. I. DAWSON, Attorney General, THOMAS B. McGREGOR, Assistant Attorney General, STEPHENS & STEELY, J. C. BIRD and J. C. SNYDER for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

In 1920 appellant, a young man then about twenty-one years of age, moved with his father's family from Tennessee to a farm on Watts creek in Whitley county.

There lived in the vicinity a family of Bennetts, and the youngest daughter of that family was Melda Bennett, then about nineteen or twenty years of age.

Shortly after the arrival of the Ellison family a friendship sprang up between appellant and Melda Bennett, and that friendship speedily developed into an ardent courtship, and the evidence seems to justify the conclusion that the affection of the young people for each other was entirely reciprocal, although it is apparent that during the progress of the courtship frequent and violent quarrels occurred between them.

Finally, however, the matter had so far progressed that they were engaged to be married and the time fixed for some time in March, 1921, and on the 18th day of March appellant procured from the county court clerk of Whitley county a marriage license authorizing him to marry Miss Bennett.

About the time, however, the license was procured, or, as he claims, shortly thereafter, he disclosed to the young lady his intention to marry her and take her to Texas to make a home, but she demurred to that plan, saying that her mother was getting old and she did not want to leave her, and apparently, for the time being their engagement was broken. At any rate shortly thereafter he returned the license to the clerk through the mails, and the record shows it was marked "not used."

However, after this time, the courtship continued as ardently as ever, and the quarrels and disagreements between the young people seemed to have been accentuated, or at least to have occurred more frequently. He continued his visits to the Bennett home as often as twice

a week during this period, almost without exception going there on Sunday. The evidence shows that the quarrels between them continued during this time and that on Saturday, June 4, 1921, he saw Melda Bennett at his own home where he had a sister who was her friend, and that he also saw her on Sunday, the 5th day of June, 1921, at her home, where he remained until eight or nine o'clock that night.

On Monday morning, June 6, 1921, Melda Bennett and her older sister, Vicie Bennett, went from their home through the country a mile or so to a small station on the L. & N. Railroad between Corbin and Williamsburg; Melda stayed at the home of some friends near this station while Vicie took a train and went to Corbin, from whence she returned on an afternoon train. Upon her return the two sisters again started toward their home, and when they reached the home of Mrs. Ida Raines they stopped and sat in her front yard with her and her two children, and in a few minutes appellant and his brother, Ira Ellison, came to the place and joined the group. They all remained there for some time and finally when they started home Melda went into the house with the expressed purpose of getting a drink of water and appellant followed her to the door, and about that time there was a pistol shot and Melda Bennett fell with a bullet through her head and died in three or four hours.

Appellant was indicted charged with murder, and upon his trial was convicted and sentenced to imprisonment for life, from which judgment he has appealed.

His only defense is that the firing of the pistol was wholly and purely an accident.

The persons immediately present at the time the shot was fired were Vicie Bennett, the sister of deceased, Ida Raines, appellant, and his brother, Ira Ellison, and the two children of Mrs. Raines, although neither of the children testified. Vicie Bennett testified that since March, when the wedding was to have been, defendant came to her home to see her sister two or three times a week and during that period he rarely ever came without a pistol, and her sister generally got hold of the pistol and put it out of his reach; during that time the attitude of the defendant had been bad, that he frequently had his gun out when he came to the house, making threats and cursing and abusing her sister; that upon one occasion she heard him say he was going to shoot her brains

out, drop his gun, and pretend it was an accident; that at another time she saw him snap his pistol at her sister, and when witness remonstrated with him, he said the pistol was not loaded; that on the day of the shooting she and her sister stopped at Ida Raines' home and that Ida and her two children, about nine and ten years old, were at home and they sat in the yard, and in ten or fifteen minutes Floyd and Ira Ellison came; that Floyd was pale and nervous, cursing and "rearing" and had a pistol in his jumper pocket—the right jumper pocket— barrel up, and that his brother, Ira Ellison, also had a pistol; that Floyd looked at her and her sister as spitefully as he could, and turned the pistol over and pulled it about half way out of his pocket and asked where Crit Eaton was, and all the time was cursing and "rearing;" that in the course of the conversation between them there Melda in speaking of a flower bush in the yard said it was pretty and Floyd said, "Yes, but by God you are not pretty;" that when they started to go home witness insisted that Ida Rains go with them, she being afraid of Floyd, and Floyd said: "By God, she don't have to go;" that when her sister got up and went into the house to get a drink of water Floyd stepped to the door near where she was, and witness heard her sister say: "Floyd! Floyd!" and about that time the pistol fired and she saw her sister fall; that at the time she was shot her sister was looking Floyd in the face; that she did not see the pistol when it fired but saw his arm come out and saw her sister fall; that the pistol dropped and witness picked it up and Floyd tried to take it away from her and his brother Ira also joined in the scuffle over the pistol, and during the scuffle the pistol went off and shot Floyd in the leg; that the small wound was in her sister's right temple and there was also a ragged wound in the rear of her head and that her face was powder burned; and that appellant said just after the shot was fired something like, "Oh, Lord, it hit Melda."

Ida Raines corroborates much of the testimony of Vicie Bennett, but says that she saw no weapons when the boys came there, but that Floyd seemed mad or in trouble when he came, but, so far as she knew, he was sober; that she did not hear Melda say "Floyd, Floyd" or anything else at the time of the shot, and that a few minutes afterward Floyd went in the room where the in-

jured girl was, and that she saw no powder burns on her face.

Appellant's version of the shooting is in substance that he and his brother were going across to a station on the railroad and that they did not know the Bennett girls were at Mrs. Raines' until they got near to the house and saw them, and they stopped, and all talked pleasantly for awhile and when something was said about the Bennett girls going home Melda asked him to go home with them and he told her he would do so; that Melda went into the house to get a drink and he stepped to the right of the door when she started after the drink; that he had his pistol in his left jacket pocket and took it by the barrel with his right hand and started to change it to the right hip pocket under the jumper jacket to keep Melda from seeing it; that he knew he was going home with her and did not want her to see the pistol, and when he went to change it and jerked it quick to keep her from seeing it, it hung in the corner of the pocket and went off; that it jarred his hand and he dropped the gun and Vicie Bennett picked it up and when they all came running up to him he was wiping powder burn from his hand; that they were all in a good humor and the whole thing was purely accidental. He further testified that a very few days prior to the shooting he and Melda Bennett had again fixed the 11th of June as their wedding day and that he had arranged with his sister, who was the house-keeper at his father's home, for them to reside there, and in this latter statement he is corroborated by the sister. The appellant's brother, Ira Ellison, testified in substance to the same that he did, they both saying that Melda Bennett's back was toward him when the pistol went off and that he was trying to get it out of his jumper pocket for the purpose of placing it in his hip pocket.

The Commonwealth, in addition to its evidence as to the happenings at the time of the shooting, showed various facts and circumstances together with numerous threats made by appellant against the dead girl. One witness stated that two weeks before the shooting she heard Melda say to him there was no use in their talking any longer, that they could not get along and they had as well quit; that he looked at her and said: "If I knew you meant this you would not live until the sun goes down," and the witness further said the defendant was then drunk.

Another witness testified that about three months be-fore the shooting defendant said he would shoot her brains out if she did not marry him, and said the same thing two or three weeks before the shooting; but the witness said that he thought the defendant was joking. Another witness said that he overheard a quarrel be-tween them in which he (defendant) said that he had a damn good notion to cut her throat.

On the other hand defendant showed by the first wit-ness who reached the scene after the shooting—about five minutes thereafter—that he found defendant lying in the yard and he said: "I have shot Melda," that he was fooling with his pistol and let it go off; that defendant went into the room where the girl was and tried to get her to talk to him and said to her that he did not do it on purpose, that it was an accident.

It was the theory of the Commonwealth that defen-dant purposely shot the girl while she was facing him and that the bullet entered in front and came out at the rear and it was the theory of the defendant in aid of his plea of accident that the girl had her back to him when he undertook to exchange the pistol from one pocket to the other when it went off and accidentally shot her in the back of the head. The evidence for the Commonwealth showed that he was very near to her when the pistol fired, and several witnesses stated that she had powder burns on her face, while an equal or greater number for the de-fendant stated they had examined her after the shot was fired and there were no such powder burns.

The evidence for the Commonwealth showed that the hole in her head in front was a very small one while the wound at the rear was a ragged one and much larger, and it likewise appeared that generally the place where a bullet enters is a smaller wound than the place where it comes out. On the other hand the defendant showed that the wound in front was three-fourths of an inch to an inch higher than the wound at the rear, and as defen-dant was on the outside of the door and the girl at the time the shot was fired was inside the house, some twelve or fifteen inches higher than he was, the argument is that he could not have shot her from the front or the bullet would have ranged upward, and that as it must have ranged upward under these conditions, the shot neces-sarily entered from the rear and must, therefore, accord-ing to his theory, have been accidental. In further sub-

stantiation of this theory of defendant that the shot entered from the rear, it is shown that after going through the decedent's head it still ranged upward and struck a clock in an elevated position in the room.

The case was tried out by the Commonwealth upon the theory that the dead girl, because of the bad conduct of defendant and of his cruel treatment of her, had broken off the engagement and was at the time trying to evade him and escape further association with him, and that he, becoming enraged at her because of these things, killed her as he had threatened to do; while the theory of the defendant was, as his evidence tended to show, that they were still sweethearts, that the relations between their families were good, and although their marriage in March had been postponed, they had continued to be sweethearts and at the time of the killing had actually fixed another date for their wedding, only a few days ahead.

Clearly the contention the verdict is not supported by the evidence, and is flagrantly against the weight of the evidence, cannot be sustained.

It is admitted by appellant that his pistol went off and killed the deceased while it was in his hand, and the evidence for the Commonwealth is that just before the pistol fired deceased exclaimed "Floyd, Floyd," as if she was in terror from some contemplated act of his; it further shows that within a short time before the shot was fired he had insulted her not only by swearing in her presence twice, but had, in addition, brutally made reference to her lack of beauty; it likewise shows that upon numerous occasions he had engaged in quarrels with her wherein he had abused her, and it is shown by several witnesses that he had often threatened to do her bodily injury, particularly if she did not marry him.

In addition, there were circumstances from which it might well have been inferred by the jury that in the last few days before the tragedy she had determined to break off the engagement and refused to marry him; it is in evidence that two weeks before she had said to him that they could not get along and they had just as well quit, and the evidence shows that he had seen her on each of the two days immediately preceding the shooting; but if anything occurred between them at either of those meetings as to the continuation of their relationship it does not appear in the evidence. It is conceded in the testi-

mony of appellant himself the marriage in March had virtually been broken off by her, because she declined to leave her aged mother and go to Texas with him.

The evidence shows him to have been a brutal, reckless young man, possessed of vicious tendencies; it shows him to have been the habitual carrier of concealed deadly weapons, even in his calls upon the young woman he professed to want for his wife, and it shows on the occasion when the shot was fired he was in a bad frame of mind, angry at the deceased and her sister and offered to them insults.

It may be admitted there was some evidence that the shooting was accidental—even some considerable—but that was the vital question of fact in the case and it was wholly the province of the jury, under proper instructions, to pass upon it.

It is further complained that the court erred to the prejudice of appellant in permitting the sister of the deceased to give evidence of other offenses by appellant. The sister in giving her evidence did state in effect that on one occasion he had snapped his pistol at her deceased sister; but that evidence, under the facts in this case, related to the previous things that had occurred between appellant and deceased as bearing upon the question of motive, and was substantive evidence on the issue of whether the killing was accidental, and was not admitted by the court for the purpose of showing the commission of any other crime by defendant.

It is also complained that the court erroneously refused to permit defendant to lay the foundation for impeaching certain statements of deceased's sister; but it is sufficient to say as to this evidence that the questions propounded were not in the proper form, as they did not fix the time, place and circumstances, nor the persons present and before whom the alleged contradictory statements were made.

The court, in its instruction submitting the defense of accident upon which the defendant relied, instructed the jury if they believed the defendant by accident shot and killed deceased they would find him not guilty, and defined an accident to be the unexpected and unforeseen happening of an act or event without negligence on the part of the one causing the act or event. In this instruction the jury was not instructed that they should believe "from the evidence" that he shot and killed her acci-

dentally, and it is earnestly urged that his was a serious error against the defendant.

It goes without saying that the words "from the evidence" should have been embraced in the instruction, but we do not see or understand how the failure to do so could have been prejudicial to defendant. His defense was thus submitted to the jury in a manner much more favorable to him than he was entitled to, for it authorized the jury to acquit him if they believed the shooting to be accidental whether they so believed from the evidence or not, and certainly he is not in position to complain on appeal of an error of which he alone could have been the beneficiary.

It is further complained that the court erred to the prejudice of appellant in the giving of a self-defense instruction because there was no issue of self-defense.

In the first place the court did not give such a self-defense instruction as is customary in homicide cases, but in giving its instructions on murder and voluntary manslaughter merely used the customary phrase in such instructions "and not in his necessary or reasonably apparent necessary self-defense." The language as so used in these instructions was merely descriptive of the crimes which the court was authorizing the jury to convict for if sustained by the evidence, and were in no sense the submission of an ordinary instruction on the law of self-defense.

But if such an instruction had actually been given, appellant could not complain of it for the reason that it would merely have submitted an issue on which there was no evidence, and would have authorized an acquittal of defendant for an additional reason not justified by the evidence, and he could not therefore have complained.

The instructions as a whole fairly submitted all of the issues made on the trial, including murder, voluntary manslaughter, voluntary manslaughter by the reckless, wanton and grossly careless handling of firearms, and involuntary manslaughter in the negligent use and handling of firearms, and we fail to see that any just complaint may be made of them.

Lastly, it is urged that the court erred to appellant's prejudice in refusing to grant him a continuance.

The affidavits of three doctors were filed on this motion and those affidavits showed, in substance, that defendant at the time of the trial was still suffering from

the pistol shot in his right leg, and that the femoral artery therein had been partially severed and the inner lining of that artery was very thin and was likely to break at any moment, in which event it would cause almost instant death, and it was believed by the physicians that he was unable to attend the trial or to walk up and down the stairway to the court room.

The granting of a continuance by a trial court is, from the necessities of the case, largely in its discretion, and its discretion will not be ground for reversal upon appeal unless there has been an abuse of it. This record shows defendant attended the trial and testified very intelligently, and there is nothing in the record to create the suspicion that he suffered any physicial misfortune by reason therefor. There is no complaint that because of his injury any witness was not procured or that his defense was not well presented

Appellant has had a fair trial, and has had the important issues presented in this case submitted to a jury presumably familiar with the parties and their surroundings, and with all the witnesses, and there being no prejudicial error in the record, the judgment is affirmed.