## Ellison v. Commonwealth

(Decided Oct. 15, 1937.)

(Rehearing Denied March 11, 1938).

PAT RANKIN and B. J. BETHURUM for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for the Commonwealth.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On and prior to Sunday, June 28, 1936, the appellant and defendant below, Harvey Ellison, operated in the village of Waynesburg, Lincoln county, Ky., a soft drink stand at which beer and nonalcoholic drinks were dispensed. Somewhere near noon on that day he shot and killed with a pistol Mack Steele, and was later indicted by the grand jury of the county in which he was accused of murdering Steele. At his trial thereunder on a plea of not guilty he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for two years, the minimum provided by the law. His motion for a new trial was overruled, and from the verdict and the judgment pronounced thereon he prosecutes this appeal. The motion set out a number of grounds therefor, as constituting prejudicial and reversible error, but on this appeal counsel have abandoned (by not arguing) many of them as contained in the motion, and have reduced them to (1) the admission of incompetent testimony offered by the Commonwealth over defendant's objections; (2) error of the court in overruling defendant's motion to discharge the jury and continue the trial of the prosecution to a future date because of alleged improper conduct of prosecuting counsel in the interrogation of witnesses; (3) error of the court in giving to the jury instruction No. 5, which was the self-defense instruction; and (4) newly discovered evidence. We will discuss and determine them in the order named.

1. The alleged incompetent evidence relied on in support of ground (1) consisted in (a) improper question asked his witnesses sustaining his reputation and character for peace, quietude, and other upright qualities by attorney for the Commonwealth in which prosecuting counsel asked whether or not they had heard

of certain named difficulties and violations of law in which the defendant was engaged, and whether or not they had heard that for the commission of some of them he had been indicted; and (b) testimony given by the undertaker as to certain physical facts he found with reference to the position of the body of deceased, location of wounds, and other physical matters that he observed upon arriving at the scene only a few minutes after the killing had occurred. The subdivisions of this ground will be determined in the order they are made; but before doing so we deem it proper to make a sufficient statement of the substance of the testimony in order to understand the nature of the case and the pertinency and relevancy of the points discussed.

Somewhere in the neighborhood of 8 o'clock on the morning of the day of the killing defendant opened his place of business, as he contends, to accommodate some of his friends by furnishing them with cold drinks, but it seems that they, and those who entered after the opening of the place, were not entirely satisfied with purely non-alcoholic drinks, but they also purchased and consumed a quantity of beer, and the crowd—or a similar one gathered for the same purpose—remained in the store until the fatal moment; among whom was the deceased, who, after remaining in the store for awhile, left it, but returned some 20 minutes thereafter. When he started to re-enter the store—the double door to which was open, but the screen doors closed—just as he was about to cross its threshold, the appellant commenced shooting him, when he fell on the outside of the building on some kind of concrete platform after defendant had shot him two or three times, and according to the witnesses for the Commonwealth (some two or three in number and who were in the house) appellant went out of his store building and shot deceased through the head after he had fallen to the concrete floor or platform upon which his body was resting.

Appellant and at least the same number, if not a greater number of inmates of the store, testified that before decedent left the store and remained away about 20 minutes he (deceased) engaged in some more or less bitter quarrels with another, or perhaps two others, and that appellant had interfered and settled those disputes, but not without deceased engaging him in one of like character, and that when deceased left he made

threats of going to procure a pistol and return to avenge his supposed wrongs. The witnesses for the prosecution testified to no such state of facts, i. e., that deceased left with any threat to procure a weapon, and some of them testified that he had a pistol in his pocket from the time he first visited the store during that forenoon, and that when he was killed he had no additional weapon, but only the one that he had been carrying throughout the day. Such prosecution witnesses, or at least some of them, also testified that at the time deceased started to enter appellant's store, upon returning from his 20 or more minutes' absence therefrom, he did not have his pistol in his hands, nor his hands upon it, as contained in his hip pocket, nor did he reach back with either of his hands toward the weapon as defendant testified. On the contrary, they testified that when appellant approached towards the door with his pistol drawn deceased threw up both his hands before he was shot, and that while in that imploring attitude appellant commenced firing upon him and shot him at least three times before he fell.

It was shown that deceased was more or less quarrelsome when drinking, and that on this occasion he was in that condition, but he was not maudling drunk, nor had he, according to the witnesses for the prosecution, been guilty of any violations of law or engaged in any conversation or conduct of a threatening or rebellious nature towards appellant or any other person present. Perhaps a greater number of witnesses—measured by the numerical rule—gave testimony favorable to appellant, but not supporting his testimony in its entirety, while a less number of eyewitnesses, who were equally emphatic in what they stated, made out a clear case of wholly unjustifiable homicide. Of course, the case is like almost every one of its kind wherein contradictions between the testimony of witnesses appear throughout the record, thereby creating a situation where the jury impaneled to try the facts might return a verdict the one way or the other. But the one returned in this case finding defendant guilty is amply supported by the testimony as a whole, and under a rule of universal application we are unauthorized to say that the verdict is not sustained by the testimony, or that it is flagrantly against it. Experience in studying records and disposing of issues of facts—as made and discussed there-

from on appeal to this court—soon enables one, whose duty it is to do so, to determine from the entire testimony whether or not an injustice has been done in the determination of the contested facts. With the aid of such experience we are not prepared to say that the verdict of guilty returned by the jury in this case embodies any misconception of the actual facts as they happened at the time of the fatal difficulty. Therefore, unless some of the errors, supra, argued in brief for a reversal, are sufficiently meritorious for that purpose, the judgment of guilty will have to stand as rendered, and we will now proceed with a determination of ground (1) beginning with subdivision (a) thereof.

1. It is earnestly insisted in arguing subdivision (a) of ground 1 that the complained of testimony therein violated the rule against proof of other offenses, but an examination of the record discloses that the argument is not well founded. Defendant was asked some of the questions complained of in order to ascertain his feeling toward the deceased, and which is always permissible as one of the exceptions to the rule rejecting such evidence, and which is allowed for the purpose of establishing motive. The propounding of the character of questions complained of to other witnesses, testifying as to the good character of appellant, was for the purpose of testing—not only the accuracy of their testimony affirming his good character—but also to affect the credibility of such character witness, for if they had heard of the incidents, to which the questions related, they would appear to be falsifying their answers as to defendant's good reputation to which they testified. Such method of examination in similar circumstances is universally approved, and so much so that we deem it unnecessary to cite cases in support thereof, and we will not lengthen the opinion by an attempt to do so.

The foundation for the objection to subdivision (b) of ground (1) is based upon the contention that the undertaker, in describing the physical conditions that he saw upon his forthwith arrival upon the scene, testified to facts of which only an expert was capable of giving; but we do not so appraise that testimony. He stated the position of the decedent's body lying upon the concrete, which any layman could see, and likewise testified to the location of the bullet wounds upon his body, and further testified that around a hole passing through

his head there were powder burns around the place of entrance, and that he had experience enough with wounds committed by firearms to be able to tell how near the weapon would have to be, to or away from the target, in order to produce such powder burn effects. Even if such information should be termed "expert" knowledge, the witness amply qualified himself to give it. He also testified that where the bullet making that wound struck the concrete under the head of deceased there were lead marks made on the concrete, and that a part of the brains of deceased had flowed from the wound around that spot. He likewise testified that he had seen similar indications produced by bullets, and, in effect, qualified himself to give that proof even if it should be properly classified as expert testimony. But we are extremely doubtful if it could be so classified. Neither of the alleged items of expert testimony, as given by that witness, required any expert knowledge, since the matters testified to consisted altogether of physical facts observable and to be gathered by the ordinarily intelligent layman, and for which reason the premise upon which this objection is built has no foundation in fact, and, therefore, the objection itself is without merit.

2. The basis of counsels' argument in support of ground (2) is that the character of examination, to which we have hereinbefore referred, when objected to by them, though sustained, was thereafter repeated by prosecuting counsel by them asking the same character of questions once of twice after the court had sustained objections to them, and because of such repetitions appellant's cause was extremely prejudiced, and that the misconduct of counsel in repeating the questions was an error sufficiently prejudicial to authorize a reversal of the judgment. We cannot agree with that contention, even if the questions themselves were improper, but which we are not inclined to so hold. Conceding, however, for the purpose of the case that the questions were improper, their repetition after the court excluded them—for only once or twice—could not possibly, in the circumstances of the case, have adversely influenced the verdict of the jury. On the contrary, such unauthorized persistence on the part of counsel would be more calculated to prejudice the jury against his cause (the prosecution in this case) than against the

defendant in whose favor the court had made its ruling. The contention to the contrary, therefore, has no support in logic, except upon the theory that the average juror in these more modern and enlightened days—·wherein universal education ·and mental training is much more disseminated than formerly—does not possess sufficient mental power and discrimination as to not be influenced by such repetition, although he has just· heard the court tell counsel and the jury that the question itself is improper. We therefore think this ground is without merit; first, because the questions themselves were not improper in the development of the pertinent. facts to which we have hereinbefore referred as a foundation for their asking; and, secondly, that though improper, the error in repeating the questions after the court had adversely ruled upon counsels' right to propound them could not possibly have a prejudicial effect upon the verdict of the jury.

3. The only instruction complained of under ground (3) is No. 5 given to the ·jury, which is the self-defense instruction. The killing occurred, as we have stated, immediately in or close to the front entrance of appellant's storeroom. In testifying why he shot and killed the deceased, he said that he did so in order to protect his own life. He never at any time stated or intimated that he did so for the protection of his building or property, notwithstanding the court ·by instruction No. 5 given to the jury, authorized a verdict of acquittal if it were necessary for defendant to shoot and kill the deceased in order to avert danger "to his store as well as to himself." The instruction in full is in these words: "If, upon the occasion of such shooting of Mack Steele the defendant, Harvey Ellison, believed and had reasonable grounds to believe that said Steele was attempting to enter the store of defendant for the purpose of doing the latter violence or of shooting up his store, then the defendant had the right in order to avert such danger of violence to himself or to his said store to use such force to prevent said Steele from so entering such store for such purpose as was necessary, ·or as seemed to defendant in the exercise of a reasonable judgment to be necessary, even to the extent of shooting said Steele."

The criticism of it is, that it did not, in express terms, authorize the jury to believe such self-defending

facts "from the evidence." Technically speaking, the omission of those three words was improper and likewise an error. However, all of the other instructions in the case required the jury to believe the issues submitted in them "from the evidence," and the members of the jury would have been compelled to be extremely dumb to have concluded that they should not likewise be guided in determining the existence or nonexistence of such self-defending facts. This ground (as well as the other two that we have discussed) are, in their last analysis, based upon the idea of stupidity of the members of the jury. We have had more or less frequent occasion in recent years to comment upon the fallacy of such a theory. Of course, it will not be denied that instructions may be so framed as to plainly, unerringly and prejudicially depart from settled requirements in the submission of issues of fact to the jury as to require a reversal of the judgment therefor. But, when such departures (and they frequently occur) are of a minor or trifling nature, and—in the light of the entire record—could not mislead the average intelligent jury, then the omission or otherwise improper departure from the correct rule should not be construed to constitute a fatal error, since in such circumstances it cannot logically be presumed that the members of the jury were misled thereby, and we have so held in a number of cases none of which we consider it necessary to insert herein. Moreover, the instant instruction, as given, was more favorable to defendant than it would have been with the omitted words properly incorporated in it. As written, it allowed the jury to acquit him on the ground of defense of his person or property, regardless of the source from which that determination was reached by it.

In the case of Ellison v. Com., 195 Ky. 370, 242 S. W. 368, 372 (which was a homicide prosecution but a different appellant, although bearing the same name of appellant here), the defense was that the shooting was accidental, and the court submitted to the jury that defense; but in doing so the same words "from the evidence" were by mistake or oversight left out of it. In overruling the same objection, we said: "In this instruction the jury was not instructed that they should believe 'from the evidence' that he shot and killed her accidentally, and it is earnestly urged that this was a

serious error against the defendant. It goes without saying that the words 'from the evidence' should have been embraced in the instruction, but we do not see or understand how the failure to do so could have been prejudicial to defendant. His defense was thus submitted to the jury in a manner much more favorable to him than he was entitled to, for it authorized the jury to acquit him if they believed the shooting to be accidental, whether they so believe from the evidence or not, and certainly he is not in position to complain on appeal of an error of which he alone could have been the beneficiary." The holding in that opinion has never been criticised.

In the case of Langdon v. Kirtly, 7 Ky. Op. 630, an issue as to whether or not Polly Langdon was the wife of William F. Langdon was submitted to the jury, but they were not required to find that fact "from the evidence," and in overruling the objections based thereon we said: "It is true that the jury are not told in express terms that their finding must be from the evidence, but the language implied that, and the jury must have so understood the instruction." The same question was involved in the case of Louisville & N. R. R. Company v. Slusher's Adm'r, 217 Ky. 738, 290 S. W. 677 and we expressed the opinion that since the other instructions given in the case required the jury to believe the submitted issues "from the evidence," it had the effect to cure the omission in the particular instructions complained of. In the case of Jones v. Com., 200 Ky. 65, 252 S. W. 130, 133, an instruction did not require "the reasonable doubt" of the defendant's guilt to be found by the jury "from the evidence," and for which reason the error in omitting the same words, herein contended for, rendered the instruction sufficiently erroneous as to authorize a reversal; but in overruling that contention we said: "Granting for the purposes of this case this to be error, we are at a loss to understand how it could have been prejudical to defendants. The instruction appears to authorize the application of the reasonable doubt theory, even though that reasonable doubt may be induced in the minds of the jury by something outside of the evidence, and surely this was giving to the defendants a privilege to which they were not entitled." We therefore conclude that this ground should be overruled as being without merit.

4. The alleged newly discovered evidence was a witness who resided in the village and who claims to have been across the street from the scene of the shooting. He professed to narrate facts substantiating in many material respects the testimony given by defendant himself, although he was contradicted in much of his testimony by that given by eyewitnesses located at the scene. The alleged newly discovered testimony was and is strictly cumulative, and it is extremely doubtful whether or not defendant brought himself within the rule allowing to it effect—even if it were not strictly cumulative—by failing to show proper diligence to discover it before the trial. The ground of newly discovered evidence has become in recent years a most frequently employed one to obtain reversals of convictions. Observation and experience has taught that it is a most convenient one, as well as easy of procurement. Many are the cases brought to this court wherein we were misled into granting new trials therefor, and upon a second conviction, followed by a second appeal, the alleged newly discovered testimony upon which the new trial was granted by us did not appear in the case at all at the second trial. Sympathy for the distressed condition of the one convicted, as well as other influencing reasons, render it more or less easy to obtain affidavits of alleged newly discovered witnesses upon vital points in the case, and which discoveries are quickly made after conviction, but remain hidden and concealed up to the time of the trial, howsoever long the time intervening between indictment and trial. Such considerations have led courts to the conclusions that the ground of newly discovered evidence, urged as a reason for setting aside verdicts of conviction, should be scrutinized with care, and that such ground should be administered with caution. We are unable to discover any distinction between the facts of this case and many others wherein we have denied a reversal as based on this ground.

Wherefore, for the reasons stated, the judgment is affirmed.