[No. 19628. Department Two. March 29, 1926.]

THE STATE OF WASHINGTON, *Respondent*, v. HARRY
LANDAKER, *Appellant*.[1]

[1] CRIMINAL LAW (449)—TRIAL—REVIEW—HARMLESS ERROR—EX-
CLUSION OF EVIDENCE. In a murder trial of one who claimed to
have been acting with Federal liquor enforcement officers at the
time of the killing, error cannot be assigned on excluding evi-
dence that he had acted with such officers on previous occasions,
where he was permitted to go on and detail conferences and
understandings with such officers, and the witness offered was
permitted to testify that accused had several times called upon
and talked cases over with the Federal officer.

[2] SAME (229)—TRIAL—SCOPE OF EVIDENCE IN REBUTTAL. In a
murder trial, in which accused claimed to be acting with Federal
officers and to have appeared at the office to find Officer W., who
not being in, he made an affidavit for a search warrant under
an assumed name, long after his confederates had left to seize
or steal the liquor, it is not error to allow W. to testify that
his office was open all of the day in question, and that it was
not customary to take affidavits in an assumed name.

[3] SAME (446)— REVIEW — HARMLESS ERROR — RULINGS AS TO EVI-
DENCE. In a murder trial, error can not be assigned on the
remark of the court that testimony objected to might not be
competent, where the question was answered before the objec-
tion was made, and no motion was made to strike the answer.

[4] HOMICIDE (82) — SUFFICIENCY OF EVIDENCE — ACCESSORIES. A
conviction of murder in the first degree, by one who participated
in a robbery of the deceased, is not unwarranted on the theory
that the robbery had been already consummated and that the
accused had withdrawn from the scene before the crime, where
it appears that accused and his confederates were engaged in
stealing liquor, the deceased was being held prisoner while
accused was carrying away and concealing the first load of
liquor, and returned for more, only to find that the deceased
had been killed; since the robbery had not been completed or
accused's participation ended.

Appeal from a judgment of the superior court for
King county, Smith, J., entered May 9, 1925, upon a
trial and conviction of murder. Affirmed.

[1] Reported in 244 Pac. 555.

*Henry Clay Agnew,* for appellant.

*Ewing D. Colvin* and *R. M. Burgunder,* for respondent.

TOLMAN, C. J.—Appellant was charged, with four others, with the crime of murder in the first degree, while engaged in, and in withdrawing from the scene of, a robbery. The information charges that the actual killing was done by a certain two of the defendants therein named, and that the appellant and two others, while wilfully and feloniously engaged with all and each of the persons so charged, did, though not actually present at the shooting, wilfully and feloniously aid and abet the actual killers in causing the death of the murdered man. From a verdict of guilty and a judgment thereon, fixing the penalty at life imprisonment, appellant brings the cause here for review.

In order to understand the particular points here presented and relied upon, it will be necessary to give a brief and very general outline of the state's case and the theory upon which it sought a conviction. It was shown by the state that, on May 31, 1924, at four o'clock in the morning, two automobiles left the apartment house in the city of Seattle, in which the appellant resided, and went, in a southerly direction to a point six miles beyond the city of Renton, to a ranch occupied by the decedent Louis Barei. These cars carried the appellant, one Frank Stevens (alias Montrose), who resided in the same apartment house with the appellant, and Oscar L. Redden and Joseph Burt, two police officers of the city of Seattle. Arriving near the Barei ranch, the automobiles were stopped under the screen of certain standing trees, so they could not be readily observed from the ranch, and there they waited for several hours, it being the theory of the state that they were waiting for a truck-load of liquor to leave the

ranch, with the intention of stealing the liquor. No load of liquor appearing, this attempt was apparently abortive.

On the following Monday, at the same hour, the same automobiles, occupied by the same men, together with another defendant, Chester Rothermell, again left Seattle for the Barei ranch, waited in the same place for several hours, watched the occupants of the ranch endeavoring to extricate a cow which was mired, and finally Redden, Montrose and Burt took one of the cars, drove around to the rear of the place, and, leaving the car, walked through the timber and brush to the rear of the ranch buildings, where they discovered a quantity of liquor. Burt returned to the point where appellant and Rothermell had remained on watch, told them of the discovery of the liquor, and took them to the place where it had been found.

All were engaged in removing the liquor when they observed three of the Italians, occupants of the ranch, coming toward them. Believing that they had been discovered, appellant and three of his companions ran toward the Italians, each drawing a revolver, and held them up. Thereafter the Italians were conducted to a place where they would be concealed from the view of people passing on the road. Montrose is said to have entered the house and to have robbed another Italian found there, and compelled him to join those already being held captive. One of the Italians, thus treated, testified that he recognized appellant and Montrose as being two members of a gang that, several days previously, had held up the men on a ranch near Kent and stolen some eighty gallons of liquor. At about this stage of the proceedings, the defendant Burt was sent back to Seattle to get a search warrant, and appellant, with the others, proceeded to load captured liquor into

appellant's automobile. Appellant and Rothermell took the load of liquor to a point some three miles distant from the ranch, along a little-used road, and hid the liquor in two different places. They then returned to the ranch, presumably for another load of liquor, and then learned that Louis Barei had been shot and that Montrose had fled. The evidence tended to show that, while the appellant and his companion were thus engaged in carrying off and hiding the liquor, Redden and Montrose got into some sort of an altercation with the Italians whom they were holding, and both Montrose and Redden shot at Louis Barei, and from the result of these shots he shortly afterwards died.

When appellant and Rothermell returned from hiding the first load of liquor, they found no one about the place, but shortly afterwards Redden came from the woods, where apparently he had been hiding, and joined appellant and Rothermell. Appellant went to the place where the shooting had occurred and found a bullet, but, seeing no blood, concluded that no one had been seriously hurt, and they waited about the place for Burt to return with the federal officers. In the meantime Burt pursued a leisurely course to Seattle; inquired for a federal officer, whom he apparently knew; not finding him, left word with his wife appointing a time and place to meet him; went to the United States Marshal's office; inquired for a certain deputy; and, he being out, Burt repaired to the place appointed for the meeting with the federal prohibition officer; and, he not appearing, Burt thereafter, giving an assumed name, appeared before another federal officer, swore out a search warrant, and with him and another started back for the Barei ranch. The sheriff's office having been notified of the shooting, appellant and his companions were arrested at the ranch, and, as the party

was returning toward Seattle, they met Burt with the two federal officers, and Burt was also arrested. The prisoners were taken to the sheriff's office and questioned, each telling a different story, and none of them mentioning the carrying away and hiding of the liquor which had been removed. It was the theory of the state that the persons charged with this crime were intending to steal and carry away all of the liquor on the Barei ranch, and then report the discovery of a still and liquor there to the federal officers, so that a raid by them would cover up their tracks and avert any possible suspicion. There is, of course, much other testimony and many details which, while interesting, we do not think it necessary to here set out.

The errors assigned are:

First, the refusal to admit evidence of the witnesses Burt and Mooring to the effect that the defendant Burt had, at other times under like circumstances, cooperated with the federal prohibition officers in raiding stills and obtaining evidence.

Second, in admitting, over objection, testimony of the witness Whitney in rebuttal to the effect that he was in his office all day on June 2, and that it was not the practice of prohibition officers to accept an affidavit by one who had signed a fictitious name.

Third, in refusing to admit evidence of any conversation between the defendants while on the Barei ranch, except that which occurred when the state witness was present.

And fourth, in refusing to grant the appellant's motion for a new trial because of the insufficiency of the evidence.

We will discuss these several assignments in the order named.

[1] As to the first assignment of error, defendant Burt, being recalled, was asked:

"Q. Had you ever worked, or did you ever do any work, in conjunction with the Federal prohibition office? Did you ever work with or assist Federal prohibition officers in the enforcement of the prohibition law?

"Mr. Colvin: I object to that as incompetent, irrelevant and immaterial.

"The Court: Unless it is with reference to this particular case, I think it is immaterial."

And thereafter he was permitted to go on and testify that he had conferences with, and arrangements or an understanding with, the federal officers relative to the liquor on the Barei ranch. The witness Mooring, referred to in the assignment, is Mrs. H. B. Mooring, who was called and testified that her husband had died between the time of the first trial of this case and the time of the second trial; that she was acquainted with Mr. Burt, who lived next door to her; that Mr. Burt had several times called at her home and talked with Mr. Mooring about cases that he was turning over to him, or information which he had to give him; that this occurred three or four times. The only questions propounded to her to which objections were sustained were:

First, one with reference to whether or not she had access to any memorandum, which showed that Mr. Burt had participated with Mr. Mooring in any other case than in this particular affair; and, second, she was asked if she had participated with Mr. Burt in the arrest of one Chris Hardwick. In sustaining the objection to the first question, the court remarked that, if it were competent at all, the manner of attempted proof was improper, and the objection to the second question was sustained upon the ground of immateriality. In the light of what Mrs. Mooring had already testified to, we can see no error in the rulings as to her testimony.

The ruling as to Mr. Burt's testimony presents a more serious question, and, but for the fact that he was permitted to go on and testify to conferences and arrangements with federal officers with reference to the liquor on the Barei ranch, it might have been prejudicial error. With the question objected to kept clearly in mind, and also the fact that nowhere does it appear that the answers to subsequent questions did not fully answer it—there being no suggestion or offer of proof in the record which indicates that, if the witness had been permitted to answer, that answer would have gone any further, or disclosed anything more, than was disclosed by the answer to the subsequent questions—it is evident that the court's ruling deprived the jury of no competent evidence. If there was any further fact to be brought out, an offer of proof would be necessary to bring it to the court's attention and to present a question here for review. *Godefroy v. Hupp*, 93 Wash. 371, 160 Pac. 1056, Ann. Cas. 1918E 494; *Van Delinder v. Richmond*, 112 Wash. 191, 191 Pac. 850.

[2] Mr. Burt's testimony as to his movements in getting the federal officers was of a character which invited attack by the state. If he and his companions were honestly trying to help in the enforcement of the federal laws and nothing else, it would seem that, leaving his companions early in the forenoon in charge of liquor and lawbreakers with no warrant to justify them, he would have made haste to put their enterprise upon a lawful basis, instead of which he whiled away the greater part of the day "doing nothing but," as he says, waiting for certain officers with whom he was personally acquainted, and finally, they not appearing, he went to others and testified that they directed him to use an assumed name in swearing out the search warrant. Under these circumstances, we see nothing

improper in permitting Mr. Whitney, who was in charge of the federal prohibition office for this state, to testify that the office was open all day, and that it was not the practice in such matters to accept an affidavit signed by a fictitious name.

[3] When appellant was on the stand he was asked: "Q. Did he [Burt] tell you where he was going when he passed you there in the car? A. Yes, sir." After the question was answered the prosecutor objected, and then ensued a colloquy between counsel and the court, in the course of which the court remarked, in effect, that conversations between the defendants had when no witness for the state was present, could not be met by the state and might not be competent; but, however unsound the court's statement might have been, it was not a ruling; no question was before the court to be ruled upon. The witness had already answered the question before the objection was interposed, and no motion to strike the answer was made. Nor could there have been any prejudice. The examination of appellant immediately proceeded. "Q. Where did Burt go? A. He went to town after some federal men." So everything sought by the question was fully put before the jury.

[4] Was the evidence sufficient? Appellant contends that because he was not present when the crime was committed, and did not know that the crime was to be committed, and also because the crime of robbery, if there was such, had completely terminated and ceased and he was no longer engaged in a common purpose with those who did the killing,—the evidence is wholly insufficient. Authorities are cited to the effect, that no inference of combining to effect an escape can be drawn from the proof of a combining to do the original wrong. That may be the law, but we have no occasion to con-

sider that question here. The state's evidence tends to show a combining to hold captive by fear or force the makers of the liquor, and to steal and carry it away. While appellant was carrying away and hiding the liquor, those others of the defendants, who did the killing, were holding the persons from whom the liquor was being taken. The original wrong had not yet been fully completed, and if the state's theory be right, as the jury found, then all intended that the Italians should be held helpless and harmless until the liquor was all removed, and the federal officers would then have been produced to take possession of the still and the empty containers. Then, and not until then, would the original purpose have been completed.

Finding no error, the judgment appealed from is affirmed.

PARKER, MAIN, MITCHELL, and MACKINTOSH, JJ., concur.