[No. 24590. Department Two. December 18, 1933.]

THE STATE OF WASHINGTON, *Respondent,* v. A. E. PIERCE, *Appellant.*[1]

[1] Reported in 27 P. (2d) 1087.

524

*Sam A. Wright* and *Henry Clay Agnew,* for appellant.

*Robert M. Burgunder* and *John F. Walthew,* for respondent.

BLAKE, J.—By information, filed February 26, 1932, by the prosecuting attorney of King county, defendant was charged with the crime of grand larceny on nineteen counts. By information filed July 23, 1932, he was charged with the crime of forgery on three counts. The causes were consolidated for trial, and the jury returned verdicts of guilty on all three counts of the forgery information and on sixteen counts of the grand larceny information. From judgment and sentence on the verdicts, defendant appeals—the cases being consolidated on appeal.

Appellant assigns error as follows:

"(1) In refusing a further continuance.

"(2) In refusing to grant the motion for a mistrial.

"(3) In refusing the testimony of Dr. Ghiglione offering to prove defendant's physical and mental condition.

"(4) In denying appellant's motions for a directed verdict as to each count.

"(5) In denying appellant's motions that the prosecutor be required to elect between certain counts.

"(6) In sustaining objections to the testimony of the defendant to the effect that the claims of the Washington Loan and of the Home Savings for moneys advanced to the Radio Company had been repaid from the sale of said companies.

"(7) In commenting on the evidence by stating that the court's 'personal view' was that the value of the Radio Stations was completely immaterial but that the court would admit the evidence.

"(8) In giving instruction No. 36."

The first three assignments of error involve the question of appellant's physical condition, it being claimed that he was in such a weakened condition physically as to be subject to periodic lapses into unconsciousness during the trial.

The causes were set for trial for October 3, 1932. On September 27th, appellant interposed a motion to vacate the setting, or, in the alternative, for an indefinite continuance. This motion was supported by affidavits to the effect that appellant was physically unable to withstand the strain of a protracted trial, and that, during the course of such a trial, he would, because of his physical infirmity, become so exhausted that he would be unable to comprehend much, if not all, of the proceedings. The case was continued for two weeks. On October 13th, another motion for continuance was interposed. This motion was supported by the affidavit of one of appellant's counsel, and was predicated on convenience of counsel, as well as the physical infirmity of appellant. The cause was again continued for trial to October 31st.

When the case was called for trial on October 31st, counsel for appellant interposed an objection to going on trial on the ground ''that defendant is not in condition to be tried, because he cannot, throughout the whole trial, understand what is going on.'' No motion for continuance was made at this time. Counsel for appellant, however, offered physicians as witnesses who, he asserted, would corroborate his statement above quoted. The court declined to hear the physicians, on the ground that, no motion for continuance being interposed, there was nothing before the court to pass upon.

The cause then proceeded to trial. On November 3d, at four o'clock p. m., counsel for appellant asked leave to put a physician on the stand in support of an application to adjourn until the next morning. After some colloquy between the court and counsel, adjournment was had until next morning, November 4th, at nine-thirty.

When court reconvened, counsel for appellant interposed a motion for mistrial, supported by affidavits of appellant, his wife and his sister-in-law, to the effect that appellant had been unconscious during a considerable portion of the previous afternoon's session. The motion was denied, and the trial proceeded. From this time on, the appellant was permitted to attend the session of court on a stretcher.

During the progress of appellant's examination as a witness in his own behalf, his counsel said:

''I offer to prove by the testimony of A. J. Ghiglione that he is a licensed and practicing physician and surgeon and has been a physician for the defendant for many months prior hereto. That he has examined the defendant during the course of the trial and that he at our request examined him again this noon, that he feels that the defendant would be able to testify and understand questions for a short time provided the

examination was not prolonged, but as soon as it became apparent that he did not understand the questions, and he thinks that would be the case for periods of about half an hour, that the trial should be rested or some other witness put on, while he was given an opportunity to rest.''

The court declined to receive the physician's testimony.

Applications for continuance generally rest in the sound discretion of the trial court. This rule is applied in criminal cases to continuances asked on the ground of physical infirmity of the accused. 16 C. J. 457; *State v. Jacobs,* 131 Wash. 490, 230 Pac. 647; *State v. Clark,* 156 Wash. 47, 286 Pac. 69; *Nix v. State,* 20 Okla. Cr. 373, 202 Pac. 1042; *Rowland v. State,* 125 Ga. 792, 54 S. E. 694; *Clement v. U. S.,* 149 Fed. 305; *Ellison v. Commonwealth,* 195 Ky. 370, 242 S. W. 368; *Goddard v. State,* 78 Ark. 226, 95 S. W. 476.

We are here called upon to determine only whether the trial court abused that discretion. The three assignments of error under consideration are designed to show an abuse of discretion. They, however, fail to take into account the court's own powers of observation. It appears from the record that the trial court was keenly conscious of his obligation to see to it that appellant had a fair trial. Frequent recesses were had at appellant's request. At no time was he denied the privilege of resting. The trial court, from his observation of appellant, deemed him to be, at all times, conscious. And we think appellant's testimony supports the view of the court in this respect. Notwithstanding his physical infirmity, appellant testified with remarkable clarity to most complex transactions covering a period of several years.

We think what was said in *Clement v. U. S., supra,* is peculiarly applicable here:

"We are impressed by the careful and repeated consideration given to defendant's application by the trial court that the judges acted with great deliberation and consideration for defendant, and decided adversely to him out of a deep sense of the demands of public justice, as well as with due regard for his own welfare. In view of the reasons assigned for overruling the motions for continuance, the assurances then given that the trial would be conducted so as to obviate any severe strain by not having long sessions in a day, the length of the trial, the postponement of it for about a week after the government closed its evidence before the defendant was required to proceed, the refusal to grant a new trial to defendant, and the well-earned reputation for fairness and impartiality of the two district judges who acted on the respective applications for continuance, we think it is fair to presume that the trial was actually conducted with due regard to the age and physical condition of the defendant, and certainly that there was no abuse of the discretion lodged in the trial judges in denying the motions for continuance.''

During the period covered by the transactions here involved, the appellant was vice-president and secretary of the Home Savings & Loan Association and president of Washington Loan & Securities Company. In six of the counts on which he was convicted of grand larceny, it was charged that he abstracted and converted to his own use funds of Home Savings & Loan Association, and in ten counts it was charged that he abstracted and converted to his own use funds of Washington Loan & Securities Company. We shall not discuss the evidence as it affects each separate charge, since the use of the money in practically every instance was admitted; the defense being that it was either used for the benefit of the Home Savings & Loan Association, or that the money had been taken as a loan from the Washington Loan & Securities Company for temporary use, with the intent to

return it, and that, in such instances, it had been returned.

The evidence in this case discloses what might be called a supplemental history of the Linden radio enterprises. (See *State v. Linden*, 171 Wash. 92, 17 P. (2d) 635.)

In the latter part of 1926, Home Savings & Loan Association had invested $87,500 in bonds of Northwest Radio Service Company. Linden's companies went into the hands of receiver in August, 1929. Prior thereto, appellant had, for a considerable period of time, advanced to Linden money in amounts of several thousands of dollars every few days. These advances were sometimes made by check of Washington Loan & Securities Company, and sometimes in cash. At no time, however, did it appear on the books of either the loan association or the securities company that they had any investment in Linden's radio enterprises, except the bonds above mentioned. Appellant's position was that the advances to Linden and the moneys involved in all but three counts of the grand larceny information (which will be particularly noticed) were all paid out to protect the investment of $87,500 of the loan association's money in the bonds of Linden's company.

When Linden's company crashed in August, 1929, however, appellant desired to keep from the public and the members of the association any knowledge of the Home Savings & Loan being involved in radio. To that end, he personally took over the $87,500 in bonds. He describes the transaction in the following language:

"The bonds were being carried as other bonds on the bond investment ledger of the Home Savings & Loan. I was afraid that there might some way or other—I didn't know how—information would get out, that the Home Savings & Loan had $87,500 of these

bonds, so I gave my check to the Home Savings & Loan for the amount of these bonds and put in a receipt entry on the books showing a fictitious sale of these bonds, although the bonds themselves still remained in the vault in the possession of the association. This check went into the cash of the association but was not cashed but carried as a cash item all throughout the period of the Linden receivership and until that was out of the way."

He contends this was a fictitious transaction; that the bonds always, in fact, belonged to the Home Savings & Loan Association; and that what he did thereafter was for the purpose of protecting the investment of the association. The method that he went about it was this: He advanced money on receiver's certificates to keep the stations of the Linden companies operating; and when the property was sold under the order of the bankruptcy court, he bid it in through a personally owned company, the Northwest Broadcasting Company. Thereafter, he made advances to the latter company of sums running into thousands of dollars a day.

The methods by which these advances were made to Linden, to the receiver, and to the Northwest Broadcasting Company, were similar. Sometimes, it would be direct by check of Washington Loan & Securities Company; sometimes by cashier's check purchased with funds of that company or the Home Savings & Loan. But the prevailing method was to take cash from the cash drawer of the Home Savings & Loan and deliver it in person to the manager of the broadcasting company. The collection teller of the association, on instructions from appellant, kept five thousand dollars in the cash drawer for appellant's use. In lieu of the cash, appellant put in the cash drawer what amounted to his personal I O U, which was called a "cash item." The withdrawals at no time appeared

on the books of the Home Savings & Loan Association or the Washington Loan & Securities Company, either as an investment or a loan to Linden, the receiver, or the broadcasting company.

(In passing, it may be noted that appellant paid personal bills, taxes on his own property, and interest on his own investments, in the same manner. These latter, however, he claims were restored to the cash drawer by his own personal check or cash.)

The "cash items" were taken up in several different ways. One was to put in a check of the Washington Loan & Securities Company. This check might or might not be cashed. On one occasion, the securities company gave its check to the broadcasting company, and the latter gave its check to the association. This was done when the examiner was expected.

Another method was to borrow in the name of the Home Savings & Loan Association, and use the money to take up the accumulated cash items. These were called "unrecorded loans." They did not appear on the books of the association, although they were its obligations. It may be of interest to note specifically how these transactions were handled. On one occasion appellant made an "unrecorded loan" with the Marine Bank of fifty thousand dollars, of which thirty-three thousand dollars went to take up "cash items." Later on, he made an "unrecorded loan" with the Seaboard Bank of one hundred fifty thousand dollars. Fifty thousand dollars of this went to take up the Marine Bank loan just referred to, and approximately one hundred thousand dollars went to take up "cash items."

Now, of course, the appellant does not admit that these payments were to take up "cash items" of the character we have described. His position is that the vast accumulation of "cash items" was due to two

things: (1) That, from its inception, the association attempted to pay dividends which were not earned; and (2) operating expense exceeded operating income. To meet the requirements of this character, several devices were developed. Concerning them, appellant testified as follows:

"The first method of concealing these facts was through the use of a portion of the membership fees which were legally permitted to be charged under the building and loan plan of operation, to augment on earnings. That was during the first, approximately year and a half after July 1915. . . . Somewhere late in the year 1916 or early in 1917 it became necessary to further devise a method of paying expenses and at the same time pay the dividend rate that was being followed and the method was then first employed of failing to enter on the books of the association deposits or payments by members made when they opened their accounts. The expenses had been paid and created a deficit in the cash account of the association and such deficit in the cash account was made up by the use of these deposits that had been made by the incoming new members. Q. Now did I understand you correct, you took the cash and paid in the cash direct to make up the deficit,—A. That is correct. Q. But you would not enter that in the books of the association. A. That is correct. Q. But you would give the depositor credit in his pass book? A. Yes, sir. . . . I can't recall very definitely the time when the additional method of taking care of the deficit in the cash by reason of expenses that had been paid but not recorded as expenses, but it was some little time after the first method was first employed, that there became to be made on the books of the association unauthorized charges against the individual savings accounts of individual members. These unauthorized withdrawals are charges being shown only on the books of the association and not on the pass book of the member. . . . Well when anyone came in whose account had been manipulated previously by either method of failing to credit his account with a deposit or payment, or

the other method of charging his account without his authorization, and that person came in with a pass book and wanted some of or all of their money, it was given to them, which ever was credited, and deficit again for that amount in the cash account of the association. . . . It was quite difficult for me to employ this method of manipulation. At least I hesitated to manipulate accounts any more than was absolutely necessary for the reason that the more accounts that were so manipulated the greater chance there was of such practice becoming known to employees of the institution and possibly through them to the examiners who from time to time came in to examine and consequently I was constantly bringing the subject up to my father on the difficult task I was having in taking care of this cash deficiency that was arisen by reason of the inability of actual gross earnings to pay both expenses and current dividends.''

It is the application of this latter method to the accounts of three depositors that forms the basis of the forgery charges. In one instance, appellant forged the name of Edward C. Holland to a sight draft, payable to Washington Loan & Securities Company, and drawn on the Home Savings & Loan Association. The draft was paid. In another instance, he forged the name of W. V. Eddy to a withdrawal receipt for six thousand dollars and Eddy's account was charged with that amount. In the third instance, he forged the name of Eliza De Gennaro to a draft in favor of Washington Loan & Securities Company and drawn on Home Savings & Loan Association. The draft was paid.

It hardly requires argument or citation of authority to sustain the verdict of the jury on these counts. Nor have we any doubt of the sufficiency of the evidence to sustain the verdicts on the grand larceny information. With respect to count one, a Washington Loan & Securities Company check to Linden, appellant testified that it was a short time loan and had been repaid. The

question whether it was a loan, and, if so, whether it was genuine or fictitious, was still a question for the jury. *State v. Larson,* 123 Wash. 21, 211 Pac. 885.

Appellant contends that the evidence is insufficient to sustain the verdict on count four of the grand larceny information. He took $8,948.99 of Washington Loan & Securities money to pay notes of his own and one Edwards. He testified that it was paid back. There was testimony of two witnesses that the amount had never been repaid. The bank records did not show that such amount was credited to the securities company. The evidence was sufficient to sustain the verdict.

In count fourteen, appellant was charged with using $4,073.30 of Home Savings & Loan funds for the payment of personal taxes and personal expenses. These accounts were paid with Home Savings & Loan Association checks. He claimed that one of these he bought with one thousand dollars cash, and that the remainder had been repaid. The fact was, the "cash items" had been increasing during the period these funds were withdrawn. Furthermore, there was testimony to the effect that there had been no repayment of the amounts so withdrawn. We think the evidence was sufficient to sustain the verdict.

In count nineteen, appellant was charged with using $1,402.50 of Home Savings & Loan funds to pay interest on a personal obligation. He claimed he paid for the association check with funds of his. There was ample evidence to the effect that he did not.

The other counts of the grand larceny information appertain to the radio enterprises. As we have indicated, the evidence was sufficient to warrant the jury in believing that the funds of both the Home Savings & Loan Association and the Washington Loan & Securities Company, used by appellant in those enter-

prises, were converted to his own use with the intent to deprive and defraud the association and the securities company.

Appellant moved that the state be required to elect as between counts seven, eight, nine, ten and thirteen, on the ground that the acts charged therein constituted one continuing offense. For the same reason, a motion was made to require the state to elect as between counts eleven, twelve, sixteen and eighteen. While the offenses charged may have been continuing and might have been included in one charge, that does not preclude their being charged in different counts as separate offenses. *State v. Linden,* 171 Wash. 92, 17 P. (2d) 635; 16 C. J. 268.

Appellant assigns error because the trial court sustained objections to certain questions asked him on re-direct examination. No offer of proof was made to advise the court of the purpose of the questions. On such a record, this court cannot say the rulings were erroneous. *Chlopeck v. Chlopeck,* 47 Wash. 256, 91 Pac. 966; *Godefroy v. Hopp,* 93 Wash. 371, 160 Pac. 1056, Ann. Cas. 1918E, 494; *State v. Landaker,* 138 Wash. 267, 244 Pac. 555; *State v. Brooks,* 172 Wash. 221, 19 P. (2d) 924.

In ruling on a question asked of a state's witness on cross-examination, the court remarked: "My own personal view is that the value of it is not material at all . . ." It is claimed this constituted a comment on the evidence. The remark passed unnoticed and no exception was taken. The assignment is without merit. *Peyser v. Western Dry Goods Co.,* 53 Wash. 633, 102 Pac. 750; *State v. Surry,* 23 Wash. 655, 63 Pac. 557; *State v. Hughlett,* 124 Wash. 366, 214 Pac. 841.

The court instructed the jury that if the appellant appropriated any of the money referred to in any

count in the information, with intent to deprive or defraud the owner, then his ability or intention to pay it back, or the fact that he derived no personal benefit from it, or that the company or association sustained no ultimate pecuniary loss thereby, was all immaterial. The instruction correctly stated the law. *State v. Larson,* 123 Wash. 21, 211 Pac. 885; *State v. Linden,* 171 Wash. 92, 17 P. (2d) 635; *State v. Price,* 173 Wash. 108, 21 P. (2d) 1038.

The judgment is affirmed.

BEALS, C. J., GERAGHTY, TOLMAN, and HOLCOMB, JJ., concur.

