## STATE v. ROUSE

(No. 2246; March 15, 1943; 134 Pac. (2d) 1116)

For the defendant and appellant there was a brief and an oral argument by *Walter Q. Phelan* of Cheyenne.

For the respondent there was a brief by *Ewing T. Kerr*, Attorney General; *Harold I. Bacheller*, Deputy Attorney General and *Arthur Kline*, Assistant Attorney General of Cheyenne, and oral argument by *Mr. Bacheller*.

RINER, Justice.

James J. Rouse was convicted in the District Court of Goshen County of the crime of "murder in the first degree". The jury added to their verdict the words "without capital punishment". He was accordingly sentenced to serve a term of life imprisonment in the Wyoming penitentiary at Rawlins. From this judgment the present appeal is prosecuted. Rouse will hereinafter usually be mentioned as the "defendant".

When arraigned the defendant entered two pleas, viz., "not guilty by reason of insanity" and "not guilty". Under the first plea, after a trial before a jury, pursuant to the direction of Section 3 of Chapter 83, Laws of Wyoming, 1939, he was found through that investigation to be sane. Thereafter he was again placed on trial before a new jury on the second plea aforesaid, with the result hereinabove indicated.

The facts in the case appear to be substantially these: Commencing about February 15, 1938, the defendant was engaged in conducting the business of running a cafe in the town of Mitchell, Nebraska, which

business was continued until about the month of November, 1940. On the 5th day of May, 1939, he commenced to operate a similar enterprise in the town of Torrington, Wyoming, the business being transacted under the name of the "Torrington Cafe".

About three months before May 8, 1941, the date when the homicide involved in this case occurred, a man by the name of Jack Carpenter commenced to work for the defendant as cook and dishwasher in the cafe aforesaid, his hours of employment being from seven in the morning until seven at night. For some six weeks approximately prior to May 8, 1941, he had not been retained in employment by the defendant.

The evening of May 8, 1941, about 11:30 P. M., Carpenter was in charge of the Club Cafe, another eating house also located in the town of Torrington, Wyoming. With him at the time were four other people. Shortly before the time last mentioned the defendant armed himself with a twenty-two caliber repeating rifle and went a short distance from his own place of business to the Club Cafe, where he entered the street door. At the time of his entrance Carpenter was sitting on a stool talking to the other persons above mentioned. His attention being called to Rouse's entry into the room, he thereupon turned around and perceived defendant with the rifle, whereupon Carpenter said to Rouse "Put down that gun". Rouse made no response but raised the gun and shot Carpenter in the head, inflicting a mortal wound. Carpenter fell to the floor and as he did so Rouse shot him a second time, the bullet striking Carpenter's left shoulder and, as the physician who made the post-mortem examination testified, the bullet's course extended upward and lodged in the base of Carpenter's neck, in the vertebra thereof. The physician stated, as already intimated, that the head wound was the cause of Carpenter's death.

One of the four people in the Club Cafe, a man by

the name of Blumenschein, attempted to wrest the rifle from Rouse's grasp and in the struggle a third shot was fired, which lodged in the ceiling of the room. When Blumenschein took hold of the gun Rouse said to Blumenschein, "I will kill you". Finally the latter got possession of the rifle after a loaded shell had become jammed in its mechanism. Thereupon Rouse left the cafe, climbed into his car parked a short distance away from the entrance and drove off. Shortly afterward he was followed by police from Torrington, who took the defendant into custody, after his car had overturned about three-quarters of a mile south of the town. In that accident the defendant suffered some injuries. The officers brought him back to Torrington and placed him in jail.

The main contention of the defendant, that there was prejudicial error committed on the trial of the case, appears to be based upon an offer of proof which was ruled out by the trial court. That offer, as the record shows, was made under the following circumstances: Defendant's counsel asked the defendant two questions, viz., "Can you tell the Court and jury when your wife, Mrs. Rouse, left Torrington"? and "Did you, Mr. Rouse, at any time before the 8th of May, 1941, have a conversation with your wife about Mr. Jack Carpenter"? Objections were interposed to these questions by the County Attorney, the objections being sustained by the District Court. Thereupon counsel for Rouse out of the hearing of the jury made the following offer of proof:

"We offer to prove by the witness now on the stand that about the first week in April, 1941, the witness, who is also the Defendant, had a conversation with his wife, in which she told him that the deceased, Jack Carpenter, had taken her, the said Mrs. Rouse, for a ride in the Rouse's car, and taken her to the roadhouse known as the State Line, about seven miles from Torrington; that at that place he had bought whiskey and

other liquor for the said Mrs. Rouse, and that she became intoxicated; and that while she was in an intoxicated condition, the said Jack Carpenter took the said Mrs. Rouse out in the car to an isolated place off of the highway, where he seduced her and had sexual intercourse with her. We further offer to prove that as a result of this information received by the Defendant from his wife, his wife left him and left Torrington and has not returned".

Upon objection interposed by the County Attorney this offer of proof was declined by the court and due exception was by the defendant saved to that ruling. After a careful analysis of the offer of the testimony we are inclined to think that the court was not mistaken in the ruling thus made for the following reasons among others:

It is evident that the information concerning Mrs. Rouse's misconduct due to the improper behavior of Carpenter was communicated to Rouse substantially an entire month before the homicide occurred. So far as can be gleaned from the record this gave Rouse ample time to recover from any passion or mental excitement engendered by the information thus given him by his wife.

In the case of State v. Flory, 40 Wyo. 184, 276 Pac. 458, where it was contended that certain evidence of provocation was admissible for the purpose of mitigation of the degree of the crime involved in that case, it was said:

"The state contends that the testimony was not admissible in this case, because ample time—at least a day and probably longer—had elapsed after the defendant had been informed of the acts of decedent; further, that defendant's own testimony shows that when he was at Hudsonpillar's during the evening and night of January 15th, 1928, his blood had cooled and he was no longer perturbed. Counsel for the defendant say that when he, on the morning of January 16th, met the deceased, and the latter did not deny the rape and said

that he would keep his daughter, this was heaping insult upon injury and vividly recalled to defendant's mind what had been told him on the previous days. There is other testimony which shows to some extent at least that defendant's mind was perturbed on his way to Ostrum's. We are inclined to agree with defendant's contention. The crime of deceased, if true, was most heinous and was calculated to create a most violent passion in the mind of the defendant, and it is hardly to be expected that it would, as a matter of law, subside within so short a time, especially when, as testified, a situation arose by which past facts were clearly recalled. Courts are not altogether agreed as to whether the question of cooling time is one of law or one for the jury. Some hold it to be a question of law and that 24 hours is sufficient for the mind to cool. * * * * We think, however, that the weight of authority is that, in cases like that at bar, the question of cooling time depends on the circumstances and is ordinarily one for the jury". (Citing authorities.)

In the Flory case the homicide occurred the next day after the information concerning the alleged provocation was communicated to the defendant. In that case the Jury were allowed to determine whether there had been sufficient "cooling time". It is obvious that the situation presented there was radically different from that we find in the record before us.

In 1 Warren on Homicide, Section 91, pp. 446, 447, the author, citing cases, says:

"The law prescribes no particular time which shall have elapsed between the formation of the design to kill and the act of the killing, but only requires that sufficient time shall have elapsed to enable the defendant to reflect on the character of the act. 'Cooling time' is the space of time in which an ordinary man, in like circumstances, would require to cool. It has been held that three days, twenty-four hours, four hours, two hours, thirty minutes, fifteen minutes, and ten minutes, is a sufficient length of time; while it has also been held that three, four, or fifteen minutes is not.

"A reasonable time under all circumstances of the

particular case is sufficient. The time in which an ordinary man under or in like circumstances would have cooled is a reasonable time."

On page 453 of the same Section it is also said:

"Where the interval of time between defendant's knowledge of decedent's adulterous relations with defendant's wife and the act of killing was sufficient for reason to resume its sway, the killing is not mitigated to manslaughter".

In 2 Bishop on Criminal Law (9th ed.) 543-544, Section 712, we find it stated:

"We have no rule for determining how much time is necessary for cooling; in the nature of things, it must depend much on the particular case. Commonly the time in which an ordinary man under like circumstances would cool is the criterion. 'If two men fall out in the morning, and meet and fight in the afternoon, and one of them is slain, this is murder; for there was time to allay the heat, and their after meeting is of malice'. An hour seems to have been thought sufficient. Three and four hours respectively have been. Where a witness testified that the prisoner was 'absent no time,' though there was a pause in the fight, there was adjudged not to have been a cooling. Hawkins states: 'If two persons quarrel over night, and appoint to fight the next day, or quarrel in the morning and agree to fight in the afternoon, or such a considerable time after by which, in common intendment, it must be presumed that the blood was cooled, and then they meet and fight and one kill the other, he is guilty of murder'. When weeks have elapsed, even though the provocation was an unmentionable crime the crime will be murder".

The text of Wharton on Homicide, page 327, Section 206, states that:

"The rule that, where there has been sufficient time for the passions to subside and for reason to interpose, a homicide cannot be mitigated from murder to manslaughter on the ground of provocation has been applied to a period of about two months elapsing between the provocation and the killing."

In this connection our attention has been directed to the case of Haley v. State, 123 Miss. 87, 85 So. 129. In that case the disclosures of the wife to her husband, which were relied upon and held to be sufficient provocation to reduce the degree of the homicide to manslaughter, were made on the Monday before Wednesday (the day when the shooting took place) of the same week. That the overwrought mental condition of the defendant and his excitement over these disclosures continued during all of this period, Monday to Wednesday, is very clearly set forth in the report of the case. In the matter now at bar no such situation is presented, and the Haley decision can hardly be regarded as of any assistance in resolving the questions submitted here.

A number of interrogatories propounded to the defendant and the witnesses called in his behalf were objected to and ruled out upon such objections, but they were not followed up with offers of proof. As a consequence it was impossible for the trial court to tell just what testimony was sought to be elicited. We are consequently unable to perceive that any prejudicial error resulted as a consequence of the court's action. The following authorities would seem to announce the proper rule:

In State v. Pierce, 175 Wash. 523, 27 P. (2d) 1087, the court states the rule:

"Appellant assigns error because the trial court sustained objections to certain questions asked him on redirect examination. No offer of proof was made to advise the court of the purpose of the questions. On such a record, this court cannot say the rulings were erroneous. Chlopeck v. Chlopeck, 47 Wash. 256, 91 P. 966; Godefroy v. Hupp, 93 Wash. 371, 160 P. 1056; Ann. cas. 1918E, 494; State v. Landaker, 138 Wash. 267, 244 P. 555; State v. Brooks, 172 Wash. 221, 19 P. 2d 924."

In State v. Carey, 313 Mo. 436, 282 S. W. 22, the court remarks:

"The several exclusions of alleged proper testimony offered by appellants were not accompanied by offers of proof, and such assignments are not before us."

See also Jenkins v. State, 22 Wyo. 34, 58, 134 P. 260, 135 P. 749; Young v. State, 48 Okl. Cr. Rep. 443, 292 P. 867; Commonwealth v. Hoyt, 279 Mass. 400, 181 N. E. 473; Catron et al. v. Commonwealth, 251 Ky. 786, 66 S. W. 2d 17.

Some complaint appears to be made that the trial court interferred with counsel's opening statement on behalf of the defense. The opening statement for the defendant in a criminal case is, of course, made for the purpose of informing the court and jury what he expects to prove. We have already seen what was attempted to be proven in the case as a defense, and with that in mind we cannot say that the trial court abused its discretion in excluding from defendant's opening statement material whose admissibility, as shown by the tendered offer of proof hereinbefore discussed, was questionable. The rule seems to be that the exact scope and extent of an opening statement on behalf of the defense "rests largely in the discretion of the trial court". 23 C. J. S. Criminal Law No. 1086, 532, and cases cited.

After a careful examination of the record in the light of the foregoing authorities and others which we have examined, we are inclined to think that there is no reversible error appearing in the record before us. It follows that the judgment and sentence of the district court of Goshen County should be affirmed.

*Affirmed.*

KIMBALL, C.J., and BLUME, J., concur.