[No. 30819.  *En Banc.*  August 4, 1949.]

THE STATE OF WASHINGTON, *Respondent,* v. WAYNE LEROY
WILLIAMS, *Appellant.*[1]

¹Reported in 209 P. (2d) 331.

SIMPSON, J., dissents.

*Arnold R. Zempel* and *James Tynan,* for appellant.

*Phillip Sheridan, C. P. Brownlee,* and *Harold J. Hall,* for respondent.

BEALS, J.—The defendant, Wayne LeRoy Williams, was charged, by count I of the information, with the crime of murder in the first degree, and, by count II, with the crime of assault in the first degree. The counts read as follows:

"Count I, He, the said Wayne LeRoy Williams, in the County of Snohomish, State of Washington, on or about the 17th day of June, 1948, with a premeditated design to effect the death of Hallie Lucille Williams, a human being, did wilfully, unlawfully and feloniously strike, beat, cut and wound one Hallie Lucille Williams, a human being, with rocks and boulders, with his hands and feet, and did kick and push the said Hallie Lucille Williams in such a manner as to cause the said Hallie Lucille Williams to fall from a cliff, thereby mortally wounding the said Hallie Lucille Williams, from which said mortal wounds the said Hallie Lucille Williams died in said county and state on or about the 17th day of June, 1948.

"Count II, He, the said Wayne LeRoy Williams, in the County of Snohomish, State of Washington, on or about the 17th day of June, 1948, with intent to kill one Bernice Wil-

liams, wilfully, unlawfully and feloniously did make an assault upon the said Bernice Williams with his hands, fists and feet and did strike, beat, cut and wound said Bernice Williams with rocks and boulders and did kick and push the said Bernice Williams in such a manner as to cause the said Bernice Williams to fall from a cliff and in a manner likely to produce the death of the said Bernice Williams, . . ."

The defendant was arraigned June 22, 1948, and, in open court, the information was served upon him by handing him a copy thereof. In response to a question by the court, the defendant stated that he was not represented by counsel and that, because of lack of money, he was unable to retain an attorney. The defendant, having been asked by the court whether he desired that the court appoint counsel, answered in the affirmative, whereupon the court appointed Arnold R. Zempel, Esquire, to represent defendant, and the cause was continued to June 25th following for further proceedings.

On the day last mentioned, the defendant was brought before the court, his counsel being present, and entered a plea of not guilty to both counts of the information. Defendant's counsel, on behalf of his client, filed a written plea of not guilty by reason of insanity. By this plea, the defendant stated that he "was insane or mentally irresponsible at the time of the commission of the crimes charged," and, further, that he had become sane and mentally responsible "between the time of commission of the said crimes and the time of trial herein."

August 26th following, the defendant filed an amended plea of not guilty to the two counts charged by the information, also pleading that he was insane or mentally irresponsible at the time of the commission of the crimes charged, and

"(1) That said insanity and mental irresponsibility still exists.

"(2) That the defendant has not become sane or mentally responsible between the commission of said crimes set forth in Counts I and II of said Information and the time of trial."

In support of his amended plea of not guilty by reason of insanity, defendant's counsel filed his own affidavit, stating that, August 26, 1948, "a physician, specializing in psychiatry," had made an examination of the defendant and reported his findings to the affiant, the physician stating his belief that the defendant was, at that date, not sane and not mentally responsible.

The case was called for trial September 20, 1948, both the state and the defendant announcing that they were ready for trial. The case was submitted to the jury September 24th, and, the same day, the jury returned its verdict, finding the defendant guilty of murder in the first degree (as charged by count I of the information), and answering the question, "Shall the defendant suffer the penalty of death," in the affirmative. The jury also found the defendant guilty of assault in the first degree, as charged by count II of the information.

On the same day, the defendant moved for a new trial, upon the following grounds:

"(1) Misconduct of the jury.

"(2) Newly discovered evidence material for the defendant which he could not have discovered with reasonable diligence and produced at the trial.

"(3) Accident and surprise.

"(4) Error of law occurring at the trial and excepted to by the defendant.

"(5) That the verdict is contrary to law and evidence.

"(6) Misconduct of counsel for the Prosecution."

The defendant also made a motion for arrest of judgment, upon the ground "That there has been no proof of certain elements of the crime for which the defendant has been tried." Defendant's counsel requested that a hearing be held to determine the question of defendant's sanity, and that the judgment be suspended pending such hearing.

October 20, 1948, the defendant being present in court in the custody of the sheriff, and represented by his counsel, the court asked the defendant if he had any statement to make before sentence was pronounced, to which defendant replied that he was not guilty. Defendant's counsel then

spoke on behalf of his client and renewed his motion for the appointment of a sanity commission and suspension of judgment, which motion the court denied, whereupon the defendant was called before the bar of the court and was, by the court, sentenced to suffer the penalty of death, pursuant to the verdict of the jury upon count I of the information. As to count II of the information, the court ruled that sentence be stayed until a return of the execution of the death warrant be filed. Defendant's counsel then gave oral notice of appeal to this court.

October 22, 1948, a formal written judgment, embodying the sentence orally imposed as aforesaid, was signed by the judge and filed in the office of the clerk of the court.

The following day, defendant filed written notice of appeal to this court from the formal judgment and sentence.

In his brief, appellant makes the following assignments of error:

"(1) In denying the motion of the defense for an election as to which charge in the Information the State would proceed upon.

"(2) By denying the use of the appellant's conversations to show attitude or frame of mind, in urging the defense of insanity.

"(3) In denying the motion for the appointment of a Sanity Commission.

"(4) In putting the appellant on trial, when he was not of sufficient understanding to know the nature of the charge against him.

"(5) In denying the motion for new trial.

"(6) In denying the motion in arrest of judgment."

Appellant assigns no error upon any instruction of the court, and assignment No. 2 refers only to matters occurring before the jury during the trial. While evidence was introduced on behalf of appellant, he himself did not take the witness stand. From the evidence introduced, we make the following summary. Apparently, none of the statements made were denied by the appellant or by any witness who testified on his behalf.

Appellant is a native-born citizen of the United States, and, prior to June, 1948, was a resident of the state of Okla-

homa. During the year 1941, he married Hallie Lucille Williams, four children having been born of the marriage.

June 12, 1948, appellant, with his family, arrived in the city of Seattle, where they took up quarters with appellant's sister, at 1050 north 36th street.

On the morning of June 17th, appellant, with his wife and four-year-old daughter, Mary Bernice, left the house by automobile, apparently to look for an apartment. After an absence of several hours, appellant returned to his sister's home alone, his clothing being smeared with blood. His sister notified the police, and several officers hurried to her home, where, after adequate investigation, they placed appellant under arrest. Asked where his wife and daughter were, appellant stated that they would not come back, and, when asked what he meant, replied that he had killed them with a rock and thrown them over a cliff.

Taken to a police substation, appellant was searched, his wife's wrist watch and rings being found in his pocket. Appellant then stated, in response to questions by the police officers, that he had killed his wife and daughter, relating events which had occurred since he left his sister's home in the morning. As it appeared possible that Mrs. Williams and her daughter might not be dead, appellant having stated that he had thrown them over a cliff, several police officers and deputy sheriffs, taking appellant with them, started on a search for the scene of the crime. The sheriff of Snohomish county was also represented. The party drove here and there, looking for the place where the offense had been committed, until about nine o'clock p. m., when the search was abandoned because of darkness.

The following morning, the search was renewed, appellant then directing the officers to the place where he said he had thrown his wife and daughter over a cliff. The sheriff of Snohomish county, from the edge of the bluff, called to see if anyone would answer him. Hearing a faint reply, the sheriff climbed down the cliff about sixty or seventy feet to a ledge, where he found the body of Mrs. Williams, lying in a clump of bushes, and Mary Bernice, about six feet distant.

The child's head was covered with blood, she had a deep cut in the lefthand corner of her mouth, and a deep wound running from her eyebrows to the hairline. She was rushed to a hospital, where her wounds were dressed.

Appellant identified his wife's body, which was then taken to the morgue. Mary Bernice was very seriously injured, but recovered from her wounds.

Appellant was taken to the Snohomish county jail, where, in the presence of several persons, he made a statement, which was typed and, after a few minor corrections made and initialed by appellant, signed by him and witnessed by two of the officers. Above appellant's signature appears the following:

"I have read the foregoing statement and it is true and correct to the best of my knowledge and belief, and I am making this report by my own free will and without fear duress, or any promises.

"(SIGNED) Wayne Williams."

The statement may be summarized as follows:

Appellant stated that he and his wife had "not been getting along since we were married," but that he never had any intention of doing away with her or the children. Appellant, his wife, and Mary Bernice left his sister's home to look for a place to live. After they started, Mrs. Williams wished to drive and see the country, and return in the afternoon to look for an apartment. They drove north from Seattle, through Everett and Marysville, commencing the return journey at the latter place. On their way, they turned down a side road a short distance south of Mukilteo (it appears that this road ended at the edge of a high cliff overlooking Puget Sound). Appellant and his wife left the car, leaving Mary Bernice sleeping on the rear seat. The couple "were arguing about financial matters and health conditions." Mrs. Williams wished to return to Oklahoma. ". . . my wife decided to get back into the car. When we got near the car I picked up a boulder and hit her with it." Mary Bernice awakened, and called to her father not to hit her mother. Appellant and his wife were scuffling

and fighting, she being "about half-conscious," and appellant started to drag her to the cliff. When they reached the edge of the cliff, appellant again hit Mrs. Williams with a boulder which he picked up. She became unconscious, and he threw her body over the cliff. At this time, Mary Bernice came to the edge of the cliff, saying " 'don't daddy,' " whereupon appellant hit her upon the head with a boulder. The child fell and lay still, and appellant also threw her over the cliff, thinking that both she and her mother were dead.

Appellant then returned to his car and drove to his sister's home in Seattle. Immediately upon his arrival there, he bathed, and changed his trousers, which were covered with dust and blood. Appellant stated that, after he struck his wife with the stones, he removed her rings and wrist watch and took them home with him. The statement concludes:

". . . I just couldn't control my temper when I hit my wife and daughter with the boulders. I don't remember if my daughter screamed when I hit her. I committed this act some time in the afternoon, and was at my folk's place about twenty five minutes when the officers arrived. I travelled from the scene about 35 mph.

"The question as to whether Bernice was actually my daughter was discussed between my wife and myself a number of times. I thought Bernice was the child of her brother-in-law Buster Evans, 40 years old. He lives near Tulsa, Oklahoma. He and my mother-in-law tried to take my family away from me about three years. It was just from their remarks and actions I thought he was the father."

Thereafter, appellant was informed against, as above set forth.

In response to questions by peace officers, prior to the time he signed the written statement above referred to, appellant told other details of the crime, but further elaboration of the offense is unnecessary.

As above stated, the case was called for trial September 20, 1948. Witnesses called by the state testified to the arrest of appellant and to the search for Mrs. Williams and Mary Bernice in the afternoon and evening of June 17th and in the morning of the following day. The witnesses also de-

scribed the interrogation of appellant in the office of the sheriff of Snohomish county, June 18th, and the writing of the statement made by appellant, describing the events of the day before, the reading thereof by appellant, the corrections on the statement which he made and initialed, and his signing of the statement in the presence of the witnesses who affixed their signatures as such.

Officers of the law testified concerning statements made to them respectively by appellant after his arrest, and the sheriff of Snohomish county described his discovery of the body of Mrs. Williams and of the injured Mary Bernice. The officers also testified concerning their search of appellant's automobile and the discovery therein of some of his bloodstained wearing apparel, and a bandana that his wife had worn, which was hidden underneath the upholstery of one of the seats of the car. The officers further testified as to appellant's statements to them, describing his assault upon his wife and child, as hereinabove narrated.

The state also introduced a series of exhibits, consisting of photographs taken at the time and place where Mrs. Williams' body was found.

At the close of the state's case, counsel for appellant moved that the state be required to elect between the two counts set forth in the information and select the count upon which the state would proceed against appellant. This motion was based upon the ground that count I of the information set forth a crime which, upon conviction, might be punished by death, while conviction on the other count would result in a sentence of imprisonment only. Appellant's motion was denied, an exception to the court's ruling being preserved.

By Laws of 1925, Ex. Ses., chapter 109, § 1, p. 168, Rem. Rev. Stat., § 2059 [P.P.C. § 132-13], the statute previously in force, being Rem. Comp. Stat., § 2059, was amended to read as follows:

"When there are several charges against any person, or persons, for the same act or transaction, or for two or more acts or transactions connected together, or for two or more

acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments or informations the whole may be joined in one indictment, or information, in separate counts; and, if two or more indictments are found, or two or more informations filed, in such cases, the court may order such indictments or informations to be consolidated."

Rem. Comp. Stat., § 2059, which was amended by the section above quoted, read as follows:

"The indictment or information must charge but one crime, and in one form only, except that where the crime may be committed by use of different means, the indictment or information may allege the means in the alternative."

Laws of 1925, Ex. Ses., chapter 109, § 2, p. 168, Rem. Rev. Stat., § 2285 [P.P.C. § 112-59], amended Rem. Comp. Stat., § 2285, which referred to the conviction of a person of two or more offenses, and the service of sentences imposed upon such convictions. Section 2, by a proviso, states that whenever a person is convicted of two or more offenses, set forth as separate counts in one indictment or information, the court, in pronouncing sentence, may provide that the sentences shall run concurrently.

Appellant argues that, in view of the history of our criminal statutes and the law now in force, as above quoted, the trial court "should have told the jury, they should have dismissed from their minds the matter involving the little girl Mary Bernice (i.e. the second count of the information.)"

In the case of *State v. Unosawa*, 29 Wn. (2d) 578, 188 P. (2d) 104, we said:

"Prior to the enactment of § 2059 in 1925, it was required that the information must charge but one crime. This section merely permits two or more connecting acts or transactions, growing out of the same acts or transactions, to be included in one information, in separate counts."

Rem. Rev. Stat., § 2059, *supra*, covers three different situations in which separate counts may be joined in one information.

The two counts set forth in the information, pursuant to which appellant was tried, charged, by count I, murder in the first degree, and, by count II, assault in the first degree, committed with intent to kill. While it might well be argued that these two counts charge crimes of the same class, it is unnecessary to consider that matter, as it was alleged by the information that the crimes charged by both counts were "transactions connected together." Both crimes were part of the same plan, were committed by the same person at the same time and place, with the same instruments of destruction, namely, stones, and under similar circumstances. The information directly charged that "both crimes charged" were "connected together," and were committed as stated in the two counts. *State v. Johnson*, 23 Wn. (2d) 751, 162 P. (2d) 440; *State v. Unosawa, supra*.

The record does not disclose that appellant filed any motion or demurrer directed to the information. The question which we are now considering was first presented to the trial court at the close of the state's case, when appellant presented several motions, including a motion that the state

". . . be required to elect between the two counts, for the reason that the jury can not consider both of these counts in the same light, and under the same ruling, for the reason that one of them calls for the death penalty, and the other one does not."

At this time, the state having introduced its evidence, it appeared that the two crimes were simultaneously committed and intimately associated, each with the other. At that point in the trial, the information would, of course, be considered as supplemented by the evidence introduced. *State v. Johnson*, 32 Wn. (2d) 268, 201 P. (2d) 223.

Appellant cites the case of *State v. McCourt*, 157 Wash. 499, 289 Pac. 41, in which this court held that murder and robbery, generally speaking, were not crimes of the same class. In the case cited, while the appeal was taken after the jury had found the defendant guilty, this court was "concerned only with the question of the sufficiency of the information as against demurrer upon the ground of im-

proper joinder." The defendant did not appeal from the judgment entered upon the verdict of the jury finding him guilty of murder, as charged by count I, and robbery of the victim, as charged by count II, the appeal having been prosecuted from that portion of the judgment entered upon the jury's verdict finding the defendant guilty of robbery, as charged by the information in five other counts. The case is not in point upon the question now under discussion.

In ruling upon appellant's motion, the trial court was required to exercise judicial discretion, and, upon the record, we hold that it nowise appears that this discretion was wrongfully exercised, to the prejudice of appellant.

Appellant did not take the stand as a witness on his own behalf, but called several witnesses, members of his family and acquaintances, who testified in support of his plea of insanity or mental irresponsibility.

Appellant's counsel, in his opening statement to the jury, stated that the evidence introduced by appellant would show that he lacked sufficient mentality to know the difference between right and wrong, and that this condition existed "at the time of the crime, and that it still exists."

Appellant assigns error upon the ruling of the trial court refusing to allow his witnesses to testify concerning statements made to them by appellant, which tended to show his mental condition and, as appellant's counsel argues, tended to show that he was insane, both before and after the commission of the offense for which he was on trial.

Appellant's mother, Mrs. Nora Williams, was the first witness called on his behalf. She testified that, at the time of appellant's birth, she was suffering from malaria and uric acid poisoning, and that appellant was "a very poor, unhealthy looking baby." The witness further testified that appellant had suffered from malaria during all his life and that, in 1930, he had an acute attack of the disease, running a temperature of one hundred three to one hundred four degrees "for over a number of periods of days." The witness testified concerning certain mental peculiarities of appellant during his boyhood, and that, in 1937, while working on

an oil-drilling machine, appellant suffered a severe accident to his head, his jaw having been fractured; that, after this accident, he seemed more moody than ever before, and that this mental condition progressively became worse; that the witness was absent from Oklahoma for some time, but returned to her home in the summer of 1947, when she visited appellant and observed that his physical condition was bad, that he was nervous, and that his mental condition had deteriorated. The witness then testified that she again visited appellant in May, 1948, when she observed that he was not sleeping well, was "eating scarcely anything," and that he would sit out in the yard or take the car and drive off alone, remaining absent until late at night. The following then occurred, during the direct examination of the witness:

"Q. [by appellant's counsel] What did you observe when you saw Wayne then? A. Well, I noticed that Wayne was apparently a lot worse, and he told me the way he felt, and all, and he had been going to several doctors. MR. SHERIDAN: I object to what he told her. THE COURT: Well, that he made complaints to her is admissible; but the conversation is not. Q. Did he make any complaints to you at that time? A. Yes, sir, he told me that he felt bad. MR. SHERIDAN: Same objection, Your Honor. Q. You can't tell what he told you, Mrs. Williams. Did he make any complaints to you? A. Yes. He was working at Spartan then, and had to quit Chandler Materials and go to work at Spartan. . . .

"Q. Did he ever talk to you, or did he ever mention his physical condition to you? A. Yes, sir. Q. And in what regard? A. Well, he told me that his torso,—MR. SHERIDAN: (Interposing) I object, again, Your Honor, as to what he told her. MR. ZEMPEL: If the Court please, this is going to his mental condition, and necessarily it has to be founded somewhat on hearsay, and is not going towards the guilt or innocence of the crime. THE COURT: Conversations will not be admitted. MR. ZEMPEL: Exception. THE COURT: The fact of complaints made may be shown. Q. What kind of complaints did he make, Mrs. Williams? What did he complain about? A. Well, he complained of this heavy feeling in his stomach. He thought that his limbs were separated from his body. MR. SHERIDAN: Object to that, again, Your

Honor, for the same reason. THE COURT: It will be over-
ruled."

After learning of the death of appellant's wife, the wit-
ness came to Seattle from Oklahoma and visited her son
at the county jail. She described peculiarities then dis-
played by appellant, and further testified as follows:

"Q. Has he been speaking to you in the last couple of
weeks? A. No. The last three weeks it seemed like he
didn't recognize us, any of us. Q. Would he talk to you at
all? A. Only with just a mere nod of some kind. Q. Would-
n't speak? A. No."

During the examination of Mrs. Williams and other wit-
nesses called by appellant, the court several times ruled that
testimony would be received as to complaints on the part of
appellant, but that the witnesses would not be permitted to
testify as to what appellant said. On some occasions, how-
ever, appellant's witnesses did testify concerning statements
made to them by appellant. They were permitted to testify
at length, describing appellant's actions which they had
observed, and concerning complaints as to his health and
other matters which he had made to them, respectively, dur-
ing a considerable period of time prior to the commission
of the offense for which he was being tried.

In connection with appellant's assignment of error based
upon the rulings of the trial court above referred to, the
following texts are pertinent:

1 Wharton's Criminal Evidence (11th ed.) 428, § 318:
"When mental irresponsibility is interposed as a defense for
a criminal act, great latitude is allowed in proving the
mental condition of the accused. Both the state and the de-
fendant may go to great length in offering evidence as to
acts, conditions, and conduct of the accused, not only at
the time of the offense, but prior and subsequent thereto. Of
course, the mental condition of the accused at the time of
the commission of the offense is the material matter to be
proved, not the cause of his insanity or the time when he
became insane. . . .

"Hearsay in the neighborhood is inadmissible to prove
insanity, but the hearsay rule does not raise any objection
to statements made by the accused to others indicating an

unsound mind. The issue of insanity is to be determined by the facts proved in the particular case, such as prior insane conduct, physical peculiarities, and hereditary tendency."

3 Bishop's New Criminal Procedure (2d ed.) 1654, § 678: "A Non-expert Witness,—in a criminal case wherein insanity is set up in defense, may first state what he personally knows of the party's sayings and doings indicating insanity."

In 8 A. L. R. 1219, among the annotations, appears the following text:

"The general rule seems to be that, where the sanity of a person accused of crime is in issue, his declarations, whether written or oral, made at the time of the offense or at a time sufficiently close thereto to have some probative force in regard to his mental condition, are admissible in evidence."

Many authorities are cited in support of this text, including *State v. Constantine,* 48 Wash. 218, 93 Pac. 317.

In 22 C. J. S. 942-944, § 620, the question of the admissibility of evidence offered in a criminal trial, tending to prove the insanity of the defendant at the time of the commission of the offense, is considered. Matters which are relevant and admissible in connection with a plea of insanity are discussed, the text stating, *inter alia,* that "his spoken words, including conversations, exclamations, declarations, and his manner of speech" are generally admissible if within certain defined limits.

In the case of *State v. Constantine, supra,* the defendant appealed from a judgment of conviction of the crime of assault with a deadly weapon with intent to do bodily harm. This court reversed the judgment, directing that a new trial be granted because of certain errors which occurred on the trial. We quote from the opinion:

"Mr. Vince H. Fabin, called as a witness on behalf of the appellant, after testifying to the appellant's mental condition immediately following the shooting as he observed it, said that he accompanied the appellant's wife and daughter to the jail shortly after the appellant was arrested and placed therein. On cross-examination he was asked concerning the appellant's conduct when his wife and daughter

382

came to him at the jail, and as to certain remarks the appellant made to his daughter at that time. On re-direct examination he was asked to state what the daughter said to her father just preceding the statement which the father made and which he had repeated to the jury. To this question an objection was interposed and sustained by the court. This was a proper question and the witness should have been permitted to answer it. The matter under investigation was the condition of mind of the appellant at that time. The state sought to show that his mind was then rational by showing a particular statement made by him to the daughter which tended to indicate rationality. The appellant was entitled therefore to place before the jury such part of the entire occurrence as would in any way tend to aid the jury in arriving at the true condition of mind of the appellant. The fact called for would have been of some aid. It would have shown at least whether it was responsive or otherwise to the daughter's statement, and thus indicated in some degree either rationality or irrationality. Since the appellant did not indicate in the record what he expected this evidence to show, this error would not require reversal if standing alone. It is discussed and determined because a new trial must be awarded and the same question will probably again recur."

In the case of *State v. Flanney*, 61 Wash. 482, 112 Pac. 630, the defendant was found guilty of murder in the second degree, and appealed from the judgment entered against him. The defense was insanity at the time of the killing. In the course of the opinion, this court, speaking through Chadwick, J., said:

"We have made an earnest research of the authorities, and find that it is a first principle of the law that, in all cases involving mental responsibility, whether it be in regard to contracts, wills, etc., or crimes, every fact which tends to show that the mental condition of the subject was abnormal, at the time of the execution of the instrument or commission of the crime, is competent. Underhill, Criminal Evidence, § 159. For the mind diseased cannot be measured by the mind of another. Neither the moving cause nor the limit of its aberration is to be calculated by any standard fixed by the law or medical science. Each case fixes its own relation to the law. What may unbalance one mind and lead it to act upon its criminal impulses may have no bear-

ing whatever upon another. Therefore it is important that all things which may bear upon the subject of inquiry should be submitted to the jury, that it may say whether, from all the facts and circumstances leading up to the act complained of, the accused was in fact capable of distinguishing right from wrong when he committed the act."

In Underhill's Criminal Evidence (4th ed.) 608, § 307 (cited by the court in the foregoing quotation), appears the following:

"The conversations and the declarations of the accused uttered within a reasonable period before or after the crime are admissible to show his mental condition at the date of the crime."

In the case of *State v. Flanney, supra*, the court was not concerned with statements made by the defendant in that case. Appellant cites the case in support of his contention that this court has been liberal in construing the rule that a defendant in a criminal proceeding, who has pleaded insanity, may introduce any competent evidence in support of that plea.

While complaints or statements made by a defendant, prior to being placed upon his trial upon an information charging a crime, may constitute evidence in connection with the defendant's plea of insanity, such complaints or statements may or may not be material upon any issue raised by such a plea. A question propounded to a witness, asking what the defendant said or did, at or about a specified time, may elicit an answer which is material and relevant or, on the contrary, an answer which is nowise pertinent to the mental condition of the defendant and, therefore, not material upon the issue of the defendant's sanity or insanity.

In 4 Nichols, Applied Evidence, 3351, § 5, the rule is stated as follows:

"Generally where a question to one's witness is objected to, it must be followed by an offer of what is expected to be proved by the witness, where it is desired to complain of the exclusion of the question, at least where the propriety of the question or the materiality or relevancy of the proposed testimony is not apparent."

Many cases are cited in support of the foregoing text.

In 64 C. J. 123, Trial, § 139, the rule is stated as follows:

"An offer of proof stands in the same position as a pleading. The requirement that an offer of proof be made is not only for the purpose of first advising the trial court so that it may rule advisedly, but it is also necessary in order to preserve an exception to the exclusion of the offered evidence, and so that the appellate court may know whether the answer excluded would have been favorable to the party offering it and therefore justify a reversal and new trial."

The rule is also discussed in 6 Jones, Commentaries on Evidence (2d ed.), 4998, § 2526, and in 26 R. C. L. 1032, § 35.

In the case of *State v. Brooks,* 172 Wash. 221, 19 P. (2d) 924, the defendant appealed from a judgment entered upon conviction of assault in the second degree. Before this court, the appellant made two assignments of error, one upon rulings of the trial court sustaining objections to questions designed to attribute to the complaining witness a motive for assaulting the appellant. The evidence was in conflict as to who was the aggressor. In the course of the opinion, we said:

"As we have stated, appellant's evidence tended to show that Reynolds was the aggressor. His counsel asked him and a witness, Mrs. Augustine, certain questions, the purpose of which, he says, was to show motive for assault upon appellant by Reynolds. Objections to these questions were sustained by the court, and the trial proceeded without offer of proof of the facts sought to be elicited by the questions. From the questions alone there was nothing to indicate to the court whether or not the answers would be material or relevant to show motive. Under such circumstances, error cannot be predicated on the exclusion of testimony, unless an offer of proof is made, advising the court of the facts sought to be proven. *Chlopeck v. Chlopeck,* 47 Wash. 256, 91 Pac. 966; *Poropat v. Olympic Peninsula Motor Coach Co.,* 163 Wash. 78, 299 Pac. 979."

In the quotation from the case of *State v. Constantine, supra,* this court called attention to the fact that, as the appellant

". . . did not indicate in the record what he expected this evidence to show, this error would not require reversal

if standing alone. It is discussed and determined because a new trial must be awarded and the same question will probably again recur."

In the case of *Van Delinder v. Richmond,* 112 Wash. 191, 191 Pac. 850, an action for damages for breach of promise of marriage, this court said:

"In such cases, that is, where the question itself does not indicate clearly the evidence to be elicited, or by its terms refer to evidence submitted by an adversary, the rule is that a question addressed to a party's own witness—in this case the party himself—if objected to, must be followed by an offer of what is expected to be proved by the answer, if it is desired to complain of a ruling sustaining the objection and excluding an answer. [Citing many cases and authorities.]"

In *State v. Pierce,* 175 Wash. 523, 27 P. (2d) 1087, we said:

"Appellant assigns error because the trial court sustained objections to certain questions asked him on re-direct examination. No offer of proof was made to advise the court of the purpose of the questions. On such a record, this court cannot say the rulings were erroneous. *Chlopeck v. Chlopeck,* 47 Wash. 256, 91 Pac. 966; *Godefroy v. Hupp,* 93 Wash. 371, 160 Pac. 1056, Ann. Cas. 1918E, 494; *State v. Landaker,* 138 Wash. 267, 244 Pac. 555; *State v. Brooks,* 172 Wash. 221, 19 P. (2d) 924."

The cases of *Chlopeck v. Chlopeck,* 47 Wash. 256, 91 Pac. 966, *Hightower v. Union Sav. & Trust Co.,* 88 Wash. 179, 152 Pac. 1015, Ann. Cas. 1918A, 489, *Olive Co. v. Meek,* 91 Wash. 169, 157 Pac. 460, *Godefroy v. Hupp,* 93 Wash. 371, 160 Pac. 1056, Ann. Cas. 1918E, 494, *Simonson v. Huff,* 124 Wash. 549, 215 Pac. 49, *State v. Williams,* 12 Wn. (2d) 16, 120 P. (2d) 502, and *Tomlinson v. Bean,* 26 Wn. (2d) 354, 173 P. (2d) 972, are also in point in this connection.

In the case of *People v. Sainz,* 162 Cal. 242, 121 Pac. 922, on an appeal from a judgment of guilty of murder in the first degree, the court said (p. 246):

"By questions directed to the defendant it was sought to be shown that he fled because he was told by a man (unknown and unnamed) that two other men with guns were

in pursuit of him. The defendant was asked to give the conversation which he had with this unknown man, and an objection to this question was properly sustained. There was not disclosed to the court, as it could and should have been, the nature of the conversation sought to be elicited."

The judgment appealed from was reversed for other reasons stated by the court.

In the case of *State v. McCracken*, 22 N. M. 588, 166 Pac. 1174, an appeal by the defendant from a judgment of guilty of murder in the second degree, the court considered at length the question which we are now discussing, in the course of the opinion saying:

"In order for the appellant to raise the question as to the propriety of the ruling of the court upon the sustaining of the objection to the question, it was necessary for him to make a tender of the testimony which he expected to elicit by the interrogatory."

In the case at bar, appellant complains of the rulings of the trial court refusing to permit witnesses called by appellant to testify concerning conversations with him or statements made by him, and limiting the testimony of the witnesses to complaints made to them by appellant. Concerning such "complaints," appellant's witnesses were permitted to testify freely and at considerable length. The witnesses did not directly quote appellant's language, but the testimony they gave was, in effect, repeating what he had said. At no time did appellant's counsel make an offer of proof concerning any additional pertinent facts to which the witnesses would testify, if permitted generally to state conversations with appellant. Evidently, the word "complaints" was somewhat liberally construed, in the course of the examination of appellant's witnesses by his counsel. They testified at length concerning his appearance, conduct, acts, and complaints.

The questions propounded by appellant's counsel to the witnesses called by appellant, to which objections were sustained, afford no indication of the testimony which would have been elicited by the questions, had the witnesses been permitted to answer. If it appeared to appellant's counsel

that the witnesses might have given other competent and material testimony relevant to appellant's plea of insanity, an offer of proof should have been made, then or later, advising the court and opposing counsel as to the nature of the testimony which it was desired to present to the jury.

■■ The trial court erred in limiting testimony offered by appellant, in support of his plea of insanity, to "complaints" which appellant had made. Subject to the established rules of evidence, statements made by appellant were admissible in support of this plea. We are, however, without information as to what testimony, if any, appellant desired to introduce in support of his plea of insanity, which he was prevented from introducing by any ruling of the trial court. Under the circumstances disclosed by the record, the mere preservation of an exception affords no sufficient ground for reversal of a judgment.

Many authorities are cited by appellant to the effect that testimony concerning statements made by a defendant may be competent evidence upon an issue of sanity or insanity. That rule of evidence is well recognized; but the question before us is whether, by the rulings of the trial court, appellant was prevented from introducing before the jury relevant, competent, and material evidence in support of his contention that, at the time of the commission of the offense and at the time of the trial, appellant was insane.

It should be noted that, when appellant's counsel addressed the jury, prior to calling witnesses for appellant, he stated at some length what appellant's evidence would disclose. In the course of his address, council specifically referred to a number of items concerning which testimony would be offered on appellant's behalf. Examination of the record discloses that evidence was introduced before the jury relative to every one of the matters referred to by counsel in his opening statement.

The record discloses no reversible error in connection with appellant's second assignment.

When appellant was first arraigned, June 22, 1948, the information was served upon him and appellant stated that

he was not represented by counsel and had no money with which to pay a retainer. Appellant having requested that the court appoint counsel for him, the court appointed Arnold R. Zempel, Esquire, as counsel for appellant, and continued the cause three days. June 25th following, appellant was brought before the court, being then represented by his counsel, and entered a plea of not guilty to both charges in the information, his counsel, at the same time, filing on behalf of appellant the plea of insanity referred to above. August 26, 1948, appellant, by his counsel, filed an amended plea of not guilty by reason of insanity, to the effect that he was insane at the time of the commission of the crimes charged and that he was still insane.

After all the evidence had been introduced, but before the parties rested, appellant's counsel moved for the appointment of a sanity commission of three impartial psychiatrists to examine appellant and report to the court concerning his mental condition. The court properly denied the motion, stating that "The issues in this cause have been framed according to law and are being tried as the law provides they shall be." The state and appellant then rested, and, after an adjournment, the court instructed the jury.

While appellant excepted to three instructions given by the court, no error is here assigned upon the giving of any instruction or upon the court's refusal to give any instruction requested by appellant.

After the rendition of the jury's verdict, appellant moved for a new trial and also moved for arrest of judgment, upon the ground "That there has been no proof of certain elements of the crime for which the defendant has been tried."

October 20, 1948, appellant was brought before the court, being then represented by Arnold R. Zempel, Esquire, and James Tynan, Esquire, as his counsel, who, in addition to other matters, renewed appellant's motion for the appointment of a sanity commission and asked that judgment be suspended pending a sanity hearing, which motion the court denied. The court then pronounced sentence, which was embodied in a written judgment signed and filed Octo-

ber 22, 1948, being the judgment from which appellant has appealed.

From the record, it does not appear that, at the time appellant filed his amended plea of not guilty by reason of insanity, August 26, 1948, any application was made for the appointment of a sanity commission to examine appellant and report to the court concerning his mental condition. This plea established the issues to be tried before the court and jury. Neither does it appear, from the statement of facts, that, when the case was called for trial or prior thereto, any application for the appointment of a sanity commission was presented to the court.

October 18, 1948, appellant's counsel presented to the trial court their arguments upon their motions for a new trial, in arrest of judgment, and for the appointment of a sanity commission. Many affidavits were filed in connection with these motions, which are contained in the statement of facts. Several of these affidavits refer to appellant's mental condition and were filed in support of the contention of appellant's counsel that appellant was insane, both before and at the time of his trial. Among these affidavits is one made by Dr. Hoedemaker, whose testimony, as a witness for appellant on the trial, is referred to *infra*.

The state filed counter affidavits, including one by Dr. Stolzheise (*infra*), reiterating the doctor's opinion that appellant was sane, both at the time of the commission of the offense for which he was tried and at the time of the trial.

When the motions had been submitted, the court rendered its oral decision. After discussing the evidence at considerable length, the court said:

"I deny the motion in arrest of judgment. I deny the motion for a new trial. I deny the motion for appointment of a commission at this time."

The court then fixed October 20th as the date for rendition of the judgment and imposition of sentence, both of which were accomplished as above set forth.

We shall now consider appellant's third assignment of error, based upon the denial of his motion for the appoint-

ment of a sanity commission, and, in this connection, will discuss the evidence introduced before the jury on that phase of the case.

Dr. Ralph M. Stolzheise testified on behalf of the state, during the introduction of the state's evidence in chief, stating that he is a licensed, practicing physician and surgeon in the state of Washington; that his specialty is "neural psychiatry," to which the witness had devoted his attention for twelve years; that, June 18, 1948, he talked to the appellant concerning the statement which appellant had written and signed, and that appellant said, in the presence of the witness, that he had made the statement. In response to the question, "And what did he say relative to the paternity of Bernice," the doctor answered: "That he had doubted her paternity but he had made no attempt to find out whether she was or was not his daughter." The witness was briefly cross-examined by appellant's counsel.

Called as a witness by appellant, Dr. Edward D. Hoedemaker testified that he was a physician of many years' experience; that he had specialized "in psychiatry and neurology, that is nervous and mental diseases"; that, at the request of appellant's mother, the witness examined appellant, August 26, 1948, in the Snohomish county jail, having previously obtained from appellant's mother statements concerning appellant's family and his life history. The witness described appellant in detail, and testified at length concerning his examination of appellant and the questions which he asked appellant and the latter's answers. The witness stated, as his conclusion, that appellant was

". . . suffering from a severe form of mental illness known as paranoia-schizophrenia, and that he has been suffering with this illness probably, in my opinion, on the basis of other cases, for at least two or three years."

The witness also stated, as a second conclusion, that the act with which appellant was charged,

". . . was something that is the result of the illness, and that his judgment as a result of the illness, was affected by the illness; and that at the time of the supposed crime, or at the present time, in regard to a difference between so-

called right and wrong, he is unable to distinguish the difference because of his illness.

"I do not mean to say that he does not know what is right and what is wrong. I mean that because of the illness he is unable to control his actions, and to form judgments and to carry them out, in keeping with the knowledge, the abstract knowledge of right and wrong; and that he is in need of hospitalization and treatment; that as a result of his illness he is dangerous to be at large, dangerous to himself and to others, and should be in a mental hospital for an indefinite period."

The witness testified at length on examination and cross-examination.

In rebuttal, the state recalled Dr. Stolzheise, who testified that he had conversed with appellant for approximately an hour, the conversation dealing with appellant's past history, as well as the events of the crime with which appellant was charged. The witness detailed his observations of appellant, stating that he had observed appellant during the trial; that, in the opinion of the witness, appellant was sane on the date the witness interviewed him in the county jail, and that he was still sane at the time of the trial.

Rem. Rev. Stat., §§ 2173 and 2174 [P.P.C. §§ 133-1, -3], reads as follows:

"Any person who shall have committed a crime while insane, or in a condition of mental irresponsibility, and in whom such insanity or mental irresponsibility continues to exist, shall be deemed criminally insane within the meaning of this act. No condition of mind induced by the voluntary act of a person charged with a crime shall be deemed mental irresponsibility within the meaning of this act.

"When it is desired to interpose the defense of insanity or mental irresponsibility on behalf of one charged with a crime, the defendant, his counsel or other person authorized by law to appear and act for him, shall at the time of pleading to the information or indictment file a plea in writing in addition to the plea or pleas required or permitted by other laws than this, setting up (1) his insanity or mental irresponsibility at the time of the commission of the crime charged, and (2) whether the insanity or mental irresponsibility still exists, or (3) whether the defendant has become sane or mentally responsible between the time of the com-

mission of the crime and the time of the trial. The plea may be interposed at any time thereafter, before the submission of the cause to the jury, if it be proven that the insanity or mental irresponsibility of the defendant at the time of the crime was not before known to any person authorized to interpose a plea."

The trial court instructed the jury concerning the issue raised by appellant's plea of insanity.

In the case of *State v. Davis*, 6 Wn. (2d) 696, 108 P. (2d) 641, this court, sitting *En Banc*, held that:

"A superior court possesses inherent authority to ascertain whether or not one accused of crime and put on his trial is sane or insane at the time of trial. *State v. Schrader*, 135 Wash. 650, 238 Pac. 617, 243 Pac. 10. This power rests in the sound discretion of the trial court, and may be exercised at any time the court deems such an investigation appropriate."

The opinion also states:

"Appellant's present mental condition as to sanity or insanity is not presented on this appeal. Of course a person found guilty of the crime of first degree murder and sentenced to death should not suffer that penalty while insane. Courts possess an inherent power to act upon a showing of supervening insanity, and if necessary, to issue a stay of execution to permit a proper and adequate investigation to be made. Our courts possess this power, independent of any statutory authority. [Citing cases.] By Rem. Rev. Stat., § 6942 [P.C. § 2832], the governor of the state is vested with discretionary power to act in case of the insanity of any person confined under sentence after conviction of crime."

When appellant filed his first plea, *supra*, of course no question was presented which would call for the appointment of a sanity commission. When, two months later, he filed his second plea, stating that he was insane at the time of the commission of the offense and was still insane, his plea simply presented questions for determination by the court and jury, and, in the absence of any formal request to the court for the appointment of a sanity commission to examine appellant, there would be no question before the court upon which action should then be taken. The matter thus remained until the close of the evidence on the trial,

when appellant's counsel requested the appointment of a sanity commission. The trial court properly denied the request, as the case was ready for submission to the jury.

When the request for a commission was again proffered, on the day fixed by the court for the rendition of judgment and imposition of sentence, the trial judge, in his oral decision, summed up the situation in detail, stating that, in the exercise of the discretion vested in him by statute and his judicial office, the request would be denied.

Upon the record, it cannot be held that the court's discretion was abused.

We find no error in the court's denial of appellant's motion for a new trial, nor in the denial of appellant's motion for arrest of judgment.

The record contains no reversible error, and the judgment appealed from is affirmed.

JEFFERS, C. J., STEINERT, ROBINSON, MALLERY, SCHWELLENBACH, HILL, and GRADY, JJ., concur.

SIMPSON, J. (dissenting)—The majority opinion admits that the trial court was in error in refusing to allow witnesses to testify concerning statements made to them by appellant, but holds that appellant cannot complain because of the fact that his attorney did not make an offer of proof. I maintain that the rule relative to the necessity of making an offer of proof does not apply in this case, because of the recognized exception to the rule. That exception obtains when the proof sought to be elicited is implicit in the question itself, or when the court definitely rules, as it did on several occasions in the case at bar, that the evidence sought to be elicited would not be admitted.

Appellant's counsel attempted to show that his client had made certain statements which would indicate insanity. Examples of the evidence sought to be introduced and the rulings of the court are as follows:

Of the witness, Nora Williams:

"Q. What did you observe when you saw Wayne then? A. Well, I noticed that Wayne was apparently a lot worse,

and he told me the way he felt, and all, and he had been going to several doctors.

"MR. SHERIDAN: I object to what he told her. THE COURT: *Well, that he made complaints to her is admissible; but the conversation is not.*

"Q. Did he make any complaints to you at that time? A. Yes, sir, he told me that he felt bad.

"MR. SHERIDAN: Same objection, Your Honor.

"Q. You can't tell what he told you, Mrs. Williams. Did he make any complaints to you? A. Yes. He was working at Spartan then, and had to quit Chandler Materials and go to work at Spartan. . . .

"Q. Did he ever talk to you, or did he ever mention his physical condition to you? A. Yes, sir. Q. And in what regard? A. Well, he told me that his torso, —

"MR. SHERIDAN: (Interposing) I object, again, Your Honor, as to what he told her. MR. ZEMPEL: If the Court please, this is going to his mental condition, and necessarily it has to be founded somewhat on hearsay, and is not going towards the guilt or innocence of the crime. THE COURT: *Conversations will not be admitted.* MR. ZEMPEL: Exception. THE COURT: The fact of complaints made may be shown.

"Q. What kind of complaints did he make, Mrs. Williams? What did he complain about? A. Well, he complained of this heavy feeling in his stomach. He thought that his limbs were separated from his body.

"MR. SHERIDAN: Object to that, again, Your Honor, for the same reason. THE COURT: It will be overruled. . . .

"Q. Were you there when he was working at Spartan Aircraft? A. This last time? Q. Yes. A. Yes, that was when he had gone back to Spartan to go to work. He told me that he thought the Spartan people were in with the Chandler Materials people, working against him.

"MR. SHERIDAN: I object to that, Your Honor, any conversation they had. THE COURT: Conversations are not to be admitted."

Of the witness, Kathleen Rehbein:

"Q. What symptoms did you observe? A. The heavy feeling in his chest, he told about, and he was always tired.

"MR. SHERIDAN: I object to that, Your Honor, as hearsay. MR. ZEMPEL: If the Court please, this all goes to the mental condition and naturally it has to come some way. It is very difficult to get this type of testimony. THE COURT: *I will in-*

*form counsel that testimony will be received, if properly proferred, of complaints."*

Of the witness, Francis Williams:

"A. He was over there approximately two or three months. I saw him quite often there, once or twice a week, and he kept telling me those stories of people poisoning him around there. He thought that people were poisoning him, or trying to, the bosses there. He thought one of the bosses was the leader of them, and that they were trying to poison him; and also that there was some other fellow there that they were going to poison. He told me once that a fellow employee there had told him, —

"Mr. Sheridan: (Interposing) I object to what he told him, Your Honor. The Court: Again, I say, *the witness may testify to complaints of grievance, but not relate conversations."* (Italics in all the foregoing quotes mine.)

This record proves conclusively that the court and the prosecuting attorney knew exactly the things appellant's counsel sought to prove. Why the necessity of offering to prove conversations concerning statements made when the court definitely, and on many occasions said that *conversations or statements of appellant could not be allowed*?

The rule governing this situation is laid down as follows in 64 C. J. 124, Trial, § 143:

"Statement or Disclosure of Evidence Expected. Where the question does not so indicate, a party must inform the court as to what he expects to prove by the witness. If a question is in proper form, however, and clearly admits of an answer relative to the issue and favorable to the party on whose side the witness is called, the party is not bound to state the facts proposed to be proved unless the court requires him to do so. Where a witness has a limited capacity to testify, the party should show either by the form of his question or offer that the testimony sought comes within the limitation, but such rule does not generally apply where there is no such limitation."

This same rule is expressed in 4 Nichols, Applied Evidence, 3354, Offer of Proof, § 8:

"Where purpose of question and answer apparent. Where the question propounded made apparent the answer that would have been given, upon sustaining an objection to the

question it is not necessary to make a tender of what is intended to be established by the answer, since, when the question shows its purpose, the court is thereby enabled to rule on its admissibility."

The law is laid down in the oft-cited case of *Buckstaff v. Russell & Co.,* 151 U. S. 626, 38 L. Ed. 292, 14 S. Ct. 448. This was an action on a contract with a counterclaim interposed. The court said:

"Our rule, thus construed, is one to which parties can easily conform. Having access to the deposition containing the answer of the witness to the interrogatory, parties, as well as the trial court, are informed of the precise nature of the evidence offered. The requirement that an assignment of error, based upon the admission or rejection of evidence, must, in the case of a deposition, excluded in whole or in part, state the full substance of the evidence so admitted or rejected, means that the record must show, in appropriate form, the nature of such evidence, in order that this court may determine whether or not error has been committed to the prejudice of the party bringing the case here for review.

*"But this rule does not apply where the witness testifies in person, and where the question propounded to him is not only proper in form, but is so framed as to clearly admit of an answer favorable to the claim or defence of the party producing him.* It might be very inconvenient in practice if a party, in order to take advantage of the rulings of the trial court in not allowing questions, proper in form and manifestly relevant to the issues, were required to accompany each question with a statement of the facts expected to be established by the answer to the particular question propounded. Besides, and this is a consideration of some weight, such a statement, in open court, and in the presence of the witness, would often be the means of leading or instructing him as to the answer desired by the party calling him. If the question is in proper form and clearly admits of an answer relevant to the issues and favorable to the party on whose side the witness is called, it will be error to exclude it. Of course, the court, in its discretion, or on motion, may require the party, in whose behalf the question is put, to state the facts proposed to be proved by the answer. *But if that be not done, the rejection of the answer will be deemed error or not, according as the question, upon its face, if proper in form, may or may not clearly admit of*

*an answer favorable to the party in whose behalf it is pro-pounded.*"

(Italics in above and following cases supplied by me.)

In *Hartnett v. Boston Store of Chicago*, 265 Ill. 331, 106 N. E. 837, L. R. A. 1915C, 460 (2d) case), I find the following:

"On the trial Soderquist was a witness for plaintiff and was asked a number of questions evidently designed to show that he had never owned a gun and was not accustomed to the use of fire-arms or experienced in that respect, and objections to the questions were sustained. Error is assigned on the ruling, and one reply is that the plaintiff made no offer of proof as to what the witness would answer. *That does not justify the ruling, because where a question shows the purpose and materiality of evidence it is not necessary to state what the answer would be. If a question is in proper form and clearly admits of an answer relative to the issue and favorable to the party on whose side the witness is called, the party is not bound to state the facts proposed to be proved by the answer unless the court requires him to do so.*"

The court in *Mitchell v. Harcourt,* 62 Iowa 349, 17 N. W. 581, said:

"'The plaintiff asked one of the defendants, when on the stand as a witness, a question in the following words: 'How much did you owe?' and also other questions, so framed as to elicit the amount the defendants were indebted at the time the attachment was sued out. This evidence was objected to as immaterial and not proper cross-examination, and the objections sustained. The latter objection is not now insisted on, but it is said that the evidence sought to be introduced would not tend to establish that the grounds stated in the petition asking the attachment were true. It may be that this is so; but we think the evidence was admissible as bearing on the question of malice. If the defendants were largely in debt, taking into consideration the amount of property owned by them, and the plaintiff had information of such fact, which as a reasonably prudent person he was warranted in believing when he procured the attachment, such evidence would, we think, have a tendency to show that he was not actuated maliciously in suing out the attachment. But counsel for the defendants insists that the error cannot be corrected, because it does not appear what the plaintiff expected to prove by the witness, . . . *But we*

*think it sufficiently appears from the question asked what was expected to be proved. The true rule, we think, is that, when it is apparent on the face of the question asked the witness what the evidence sought to be introduced is, and that it is material, this is sufficient.* But when this is not apparent, then the party seeking to introduce the evidence is required to state what he expects to prove, and thus make its mater[i]ality appear."

*Hauff & Stormo v. South Dakota Central R. Co.,* 34 S. D. 183, 147 N. W. 986, concerned an automobile-train collision. Hauff, one of the plaintiffs, was asked,

"Whether, shortly after the accident, he did not have a conversation with his partner, Stormo in which Mr. Stormo, in substance stated to him, 'that this thing would not have happened, if he had held the wheel, but that Burns was holding the wheel while he was putting on his automobile gloves.' "

This question was objected to, and the objection sustained. The court in that case in the portion of its opinion relevant to the problem in the case at bar, said:

"The precise issue decisive of the case, as submitted to the jury, was whether Stormo was guilty of contributory negligence which would bar plaintiff's right of recovery. Plainly the purpose of this question was to elicit evidence of statements or admissions by the plaintiff Stormo, from which an inference of negligence on his part, might be drawn by the jury, namely: that while approaching the crossing, he (Stormo) had surrendered control of the machine to his passenger, Burns, and was himself engaged in putting on his automobile gloves, at the time, when, if he himself had retained control of the automobile, the accident would not have occurred. *It is true, no offer of proof was made, but the question itself, disclosed the materiality of the evidence sought to be elicited, and no offer of proof was necessary.* It is impossible for this court to determine what effect such evidence, if received, may have had in determining the verdict of the jury. We are clearly of opinion the exclusion of this evidence was reversible error, for which a new trial must be granted."

*In re Johnson's Estate,* 100 Neb. 791, 161 N. W. 429, involved a will contest. On cross-examination, a witness'

testimony as to certain matters was ruled out. In passing, the court decided:

"It is contended that the contestants cannot now object to this ruling because no offer of proof was made . . . Many of the rules of evidence are necessarily precise and technical. The purpose of these rules is to elicit the truth, and not to set traps for the unwary. When a question is asked that does not 'indicate to the trial court the relevancy of the testimony,' it is not error to exclude the testimony, unless the party propounding the question informs the trial court as to the relevancy of the testimony, and an offer of proof, that is, a statement of the nature of the evidence sought by the question, will enable the trial court to determine whether the evidence is competent. This rule is sometimes, though rarely, enforced in cross-examination. *When the condition of the record and the form of the question itself shows that it is relevant and competent, no offer of proof is necessary.* The many decisions of this court in regard to requiring an offer of proof should be so understood."

*Birmingham R., Light & Power Co. v. Barrett,* 179 Ala. 274, 60 So. 262, was a personal injury case. The rule with which we are here concerned is so well considered in that case that I quote it extensively:

"A definite restatement of the rule was made in *Phoenix Ins. Co. v. Moog,* 78 Ala. 284, 308 (56 Am. Rep. 31), in the following language . . . : 'The exclusion of the several questions propounded by the defendant to the witness Cook was clearly erroneous. The true rule on this subject is as follows: *If a question is propounded to a witness on the stand, the answer to which is prima facie relevant and legal testimony, and the court refuses to allow the witness to answer, this is error, for which a reva[e]rsal will lie; for the reason that "the injury to the party consists in the refusal of the court to permit the answer to be given, and he can do nothing more to prove the wrong done him than to show that he has asked a legal question, the answer to which, by the action of the court, was denied him."—Nailor v. Williams,* 8 Wall. 107 [19 L. Ed. 348]. Where no answer is given by the witness, as in this case, this does not repel the presumption of injury, provided the question itself is sufficiently definite to indicate the nature of the answer sought to be elicited, and such answer is prima facie relevant, material, and otherwise legal.—*Roberts v. State,* 68

Ala. 515. In such a case, it would add little or nothing to the enlightenment of the court for the counsel to state what is proposed to be proved by the question, because this is shown by the question itself, so far as to justify the admissibility of the answer. It is only when the question is so general in its nature that the answer sought to be elicited may as well be prima facie irrelevant and illegal testimony, as relevant and legal, that the exclusion of the question, and the refusal of the court to allow the witness to answer it, will be regarded as free from error. It is reasonable in this class of cases to require the counsel to inform the court what is proposed to be proved, so that the court may see that he seeks to elicit testimony which is proper to be admitted, and not that which is improper.—*Allen v. State,* 73 Ala. 23. If this is not done, it may be inferred by the court that, in view of the broad and comprehensive nature of the interrogatory, the answer of the witness might have been illegal, irrelevant, or even [non-] beneficial to the party. There should be no such presumption, however, in the first case, because the question is sufficiently narrow to preclude it, and the party has the legal right to examine the witness as to all relevant and legal matters within his knowledge. *When the court denies this right, and refuses to permit its exercise, there is manifest error; and error imports the presumption of injury, unless it is clearly repelled.* The adjudged cases in this state can all be harmonized in our opinion with this principle, although some expressions may be found which seem susceptible of a contrary construction.—*Burns v. State,* 49 Ala. 370. However this may be, the rule above announced is, in our opinion, the correct one.' The rule as stated in the *Moog Case* was reaffirmed in *Parrish v. State,* 139 Ala. 16, 46, 36 South. 1012, 1021, where it was said . . . 'It is true the question was not answered, and it is not made to appear what the answer would have been, except from the question itself. But this is not necessary to constitute reversible error, if the question is sufficiently definite to show that the answer would be prima facie relevant, and it indicates the nature of the answer. It is only when the question is so general that an answer cannot be said to be prima facie admissible that a party is required to inform the court what is proposed to be proven, so that the court may see that the evidence he seeks to elicit is proper. The question in this case clearly showed that it was intended to elicit an answer admissible and relevant, as tending to impeach

the evidence of the witness to whom it was propounded. This is as clearly shown by the question as if the answer had been stated to the court.—[Citing cases.]' "

Again, in *Eaton v. Blackburn,* 49 Ore. 22, 88 Pac. 303, I find the following:

"It is argued by defendants' counsel, however, that the question asked does not indicate who, if any person, 'considered' the hay marketable; that an answer to the question would have permitted a comparison of the hay shipped with other hay claimed to have been sold in various places without attempting to show that such other hay was marketable, thereby permitting the witness to speculate as to what he believed other persons thought of the hay and excluding his own knowledge in relation thereto; and that no statement was made by plaintiff's counsel of what he expected to prove by the witness; and hence no error was committed as alleged. The object of stating what fact is expected to be proved by a witness who is not permitted to answer a question is to advise the court thereof, so as to enable it to determine whether or not the testimony offered is relevant and material: *Stanley v. Smith,* 15 Or. 505 (16 Pac. 174); *State v. Savage,* 36 Or. 191 (60 Pac. 610, 61 Pac. 1128). *When the answer sought, however, is reasonably inferable from the question asked, it is not necessary to state what testimony is thus expected: Beers v. Aylsworth,* 41 Or. 251 (69 Pac. 1025). The court was sufficiently advised, from the question asked, to determine whether or not the answer sought was material and relevant, and, this being so, plaintiff's counsel was not required to state what the witness would say in response to the inquiry."

In *Cripe v. Cripe,* 170 Cal. 91, 148 Pac. 520, the court said:

"The additional point is made that the sustaining of an objection to questions like those under discussion will not furnish ground for reversal, in the absence of a statement indicating to the court the nature of the testimony sought to be elicited. *But the rule thus invoked can have no application here, since the questions themselves were so framed as to show clearly the nature and purport of the declarations sought to be proved.* Nor was the defendant called upon to explain the purpose for which the testimony was offered. Such explanation may be necessary where testimony is admissible for a limited purpose only. *But here*

*the declarations were admissible generally, and had a direct bearing on one of the main issues in the case.* We think the appellant was entitled to have this evidence heard and considered by the court."

Rules of law in criminal cases, especially as here where the death penalty has been imposed, should be strictly enforced. There is, to my mind, no good reason for denying to appellant the right to have his witnesses explain fully to the jury their recollection of the things he said, in order that the jury might better consider his mental condition. As stated by counsel for appellant, the purpose of the questions was not to prove a fact connected with the murder, but was to show appellant's mental condition. A person's mental condition must necessarily be founded to a large extent, and properly so, upon hearsay evidence.

The judgment of conviction should be reversed and a new trial granted.

---

September 22, 1949.  Petition for rehearing denied.